[Crim. No. 161.   First Appellate District.—May 6, 1909.]

## THE PEOPLE, Respondent, v. EDWARD TURPIN, Appellant.

CRIMINAL LAW—MURDER—CONVICTION IN FIRST DEGREE—SUPPORT OF VERDICT.—When, upon a trial for murder, the jury convicted the defendant of murder in the first degree, their verdict was sufficiently supported by evidence from which the jury might well believe that the defendant armed himself in full expectation of an encounter, and with the deliberate purpose to take advantage of the occasion to kill his rival, that his claim of self-defense was a pretense, that the encounter was deliberately sought for the purpose of killing the deceased, and that the killing was but the accomplishment of such deliberately formed purpose.

ID.—DEGREE OF MURDER—PROVINCE OF JURY.—The degree of murder is peculiarly a matter for the determination of the jury, and this court

will not interfere with its verdict as to the degree of the crime, except in a clear case of absence of evidence to support. *Held,* that this is certainly not such a case.

ID.—RIGHT TO PROTECT HOME—SELF-DEFENSE—LOOSE AND INACCURATE INSTRUCTION NOT PREJUDICIAL—FULL AND ACCURATE INSTRUCTIONS. A loose and inaccurate instruction on the law of self-defense given shortly after giving another independent instruction on the right of a person to protect his own home from intrusion was not prejudicial, when all of the instructions as to the law of self-defense taken together expressed fully all of the conditions under which such right might be exercised, including an instruction "that the fact that one is a trespasser upon the premises of another will not justify the other in taking life, and if the one trespassing is violently attacked, and is threatened with serious bodily injury, he may repel that attack by whatever force is necessary, even to the extent of taking his assailant's life."

ID.—REFUSAL OF REQUESTS OTHERWISE EMBODIED IN CHARGE.—It was not error to refuse instructions properly requested, when such instructions were fully covered by other instructions given by the court.

APPEAL from a judgment of the Superior Court of Fresno County, and from an order denying a new trial. H. Z. Austin, Judge.

The facts are stated in the opinion of the court.

N. C. Coldwell, G. L. Aynesworth, and J. N. Sproule, for Appellant.

U. S. Webb, Attorney General, and J. Charles Jones, for Respondent.

HALL, J.—Defendant was charged by information with the crime of murder for the killing of Frederick Roetzscher on the sixteenth day of June, 1908, in the county of Fresno. He was convicted of murder in the first degree, and his punishment fixed at imprisonment for life. This appeal is from the judgment and the order denying his motion for a new trial.

The killing of Roetzscher by defendant was admitted, the only defense attempted being that the killing was done in necessary self-defense.

Deceased and his partner, Otto Trehse, were farmers, and resided on their farm, situated near Fowler, in Fresno county. The homicide occurred on this farm. There also resided on this farm one Carl Leyman, an employee of the partners, and one Mrs. Stella Crane and her three young children. Mrs. Crane was employed to do the cooking and housework on the place, and had been so employed for about six weeks prior to the day of the tragedy. Defendant was acquainted with all the persons living on the Roetzscher place, and since the employment of Mrs. Crane had frequently called on her there. Evidence was given that he had sometimes visited her clandestinely and late at night; that prior to the day of the homicide both the deceased and his partner Otto Trehse had told defendant that he was not wanted at their home, and had forbidden him to come there. Upon two occasions at least he had been so forbidden by deceased. On Monday afternoon, June 15, 1909, defendant borrowed a six-shooter revolver, loaded in five chambers, of one David Wright, in the town of Fowler, saying at that time that he "just wanted to carry it this evening." Shortly after getting the pistol, and at about 7 o'clock of the same evening, defendant appeared at the Roetzscher house while the inmates were at supper. Deceased stepped out of the house to the back porch and met defendant, who said he had a letter for Mrs. Crane, and insisted on giving it to her in person. Deceased informed Mrs. Crane of this, and she came out and received the letter, which was written by defendant. Defendant came on a wheel, and after four or five minutes left, and returned to Fowler. Apparently nothing unpleasant occurred at this visit. After supper the three men members of the household also left the premises, but before doing so deceased, according to evidence given by Mrs. Crane, had a talk with her about defendant, in which he said that he thought defendant would come to the house again that night, and stated that he (deceased) would kill defendant if he came on the place again. Deceased returned home about 10 o'clock, while his partner stopped for a short while at a neighbor's immediately across the road from the Roetzscher place. Deceased, according to the testimony of Mrs. Crane, immediately went to her room, where she was lying on the bed with her three sleeping children, and engaged her in conversation about defendant. As he started to leave her room he looked out of the

window, and then quickly left the room, went to his own room, and then passed out onto the porch, slamming the door as he did so. (In deceased's room a shotgun was usually kept, and had been placed there this particular afternoon upon being returned by a neighbor who had borrowed it. It had been put away unloaded.) Mrs. Crane testified that she next heard a person, whom she believed by his voice to be deceased, say, "I'll shoot you, you son of a bitch," and a person whom she believed from his voice to be defendant, say, "Don't you move, don't you move, don't you move." This was followed by some shots. She then heard someone run by her window. On going out of the house she found deceased lying at the bottom of the steps leading from the back porch. Subsequent examination disclosed that he had about his face three contused wounds, one gunshot wound near the left eye, and two gunshot wounds entering the chest, either of which was fatal. He died shortly after midnight. Deceased's shotgun was found under the window of Mrs. Crane's room, where defendant testified that he had dropped it as he fled from the premises after shooting deceased. This shotgun was unloaded by Mrs. Crane, and the cartridges afterward taken possession of by the sheriff. No testimony was given as to whether they bore any evidence or marks showing that the gun had been snapped. Defendant fled from the premises to Fowler, where he got a coat and changed his hat for one belonging to a friend, borrowed some money, took a horse from his father's barn, and on the horse continued his flight to Fresno, where he bought a ticket to Stockton, but was arrested about 1 o'clock as he attempted to board the train. On being arrested he gave his name as Baker, but later admitted that he had shot deceased, and on learning he was dead said he was "damn glad of it."

Mrs. Crane was not examined as a witness for the prosecution, but was a witness for defendant, with whom she was evidently very friendly. The defendant was a witness on his own behalf. He gave no reason for borrowing the pistol on this occasion, saying simply that he did not know why he borrowed it this particular evening. He testified that he left a saloon at Fowler about 10 o'clock and went to the Roetzscher house to call on Mrs. Crane. He testified that deceased had never told him not to come to the place, but that on the

10 Cal. App.—34

contrary on that afternoon, he, defendant, had told deceased that he was coming back that night, and that deceased said "All right." That as he passed Mrs. Crane's window he tapped on the screen and walked on toward the porch steps; that, as he reached the steps, deceased came out with a shotgun in his hand, and closed the door and walked toward defendant, and asked " 'Who is it?' and I says, 'It's me,' but he says, 'Is that you, Ted?' I says 'Yes'; and he says, 'You son of a bitch, I'll kill you.' As he did he rushed off the porch, came down off the steps and threw his shotgun up at me. Whether the shotgun snapped or whether it breeched I don't know, and as he did I grabbed, that is, I got it with my hands, caught the barrel and throwed my gun up, pulled my gun and told him not to move—I think three different times, but he kept fighting all the time, and he grabbed hold of my gun, and as he grabbed it I jerked the gun loose from him and struck him with it along the face, and then he grabbed hold of his gun with both hands and jerked back, and I had right hold of the muzzle of his gun, the muzzle of the gun was right in my hands, small grip on it, he grabbed his gun with both hands, when I shot him three times. I ain't sure I shot him three times. When I hit, struck him with this gun, the gun went off, one shot, I ain't sure."

It is not contended that the evidence is not sufficient to justify the verdict, except in that it is claimed that the jury was not warranted in finding premeditation and deliberation necessary to constitute murder of the first degree. With this claim we cannot agree. From the evidence the jury might well believe that defendant armed himself in full expectation of an encounter, and with the deliberate purpose to take advantage of the occasion to kill his rival; that the claim of self-defense was but a pretense; that the encounter was deliberately sought for the purpose of killing the deceased, and that the killing was but the accomplishment of such deliberately formed purpose. The degree of murder is peculiarly a matter for the determination of the jury, and this court will not interfere with the verdict as to the degree of the crime, except in a clear case of absence of evidence to support it. This is certainly not such a case.

The only errors relied on concern the giving of certain instructions, and the refusal to give others.

The court instructed the jury as follows: "You are further instructed that under the law of this state every person has a right to protect his home from intrusion, and to employ such force as may be necessary to repel the intruder."

Later on, after giving instructions that are not criticised, covering nine folios in the transcript, the court, in defining the right of self-defense, after referring to the right as a part of the law of nature, and one recognized in the laws of all civilized people, said: "The right is expressly recognized in our statutes, and the conditions under which it may be asserted are clearly defined. These are: 1. That the party was not himself the first aggressor, or, if the aggressor, that he had in good faith withdrawn from the contest before the fatal shooting. 2. That the slaying was necessary to prevent the infliction upon himself of great bodily injury by the party slain. To justify the killing of another in self-defense it must appear that the danger was so urgent and pressing, that, in order to save his own life or to prevent his receiving great bodily harm, the killing of the other was absolutely necessary, and it must appear that the person killed was the assailant, or that the slayer had already and in good faith endeavored to decline further struggle before the fatal wound was given."

Appellant discusses these instructions together, and urges that when considered together and in relation to the evidence in the case they were calculated to impress upon the jury: (1) "that the coming of defendant upon deceased's ranch was an assault, and that such coming made defendant an assailant. (2) That such coming of defendant upon the ranch was in law an intrusion upon deceased's home. (3) That deceased might, under his rights, and as a protection to his home, make a deadly assault upon defendant if defendant would not otherwise leave the ranch, although he made no assault and used no violence against either deceased or his home. (4) That defendant could not defend himself against such deadly assault upon him by deceased until defendant had first endeavored in good faith to leave deceased's ranch."

The instructions above set forth are certainly not free from objections, and contain some loose and inaccurate statements. Among other things the court was unfortunate in the use of the word "aggressor," instead of the statutory and approved word "assailant," in the first part of the instruction regard-

ing the law of self-defense. But the quoted and attacked portions of the instructions are not all that the court said on the subject of the law of self-defense. If they were there would be much plausibility in the criticisms of appellant.

The instruction concerning the right to protect one's home from intrusion was an isolated instruction, apparently not given in connection with the law of self-defense, but doubtless given in view of certain evidence introduced by defendant through Mrs. Crane, apparently intended to show that defendant had a right to visit her at the home of deceased, notwithstanding the objections or protests of deceased, even to the extent of clandestinely visiting her there at her room at late hours of the night. As it appears in the transcript this instruction was not given in connection with the law of self-defense, but was separated from the instructions upon that subject by nine or ten folios of instructions on other subjects. After dealing with the usual phases of a trial for murder, the court, at the close of its instructions, took up the law of self-defense, and the entire instructions given by the court upon this subject were such as to fairly present the law to the jury and to fully protect the defendant in his rights in this regard. At the conclusion of its instructions upon the other phases of the law of homicide the court, of its own motion, said: "In the present case if the jury believe from the evidence that the defendant fired the shot by which the deceased was slain, then they will consider the claim of the defendant that it was in necessary self-defense, and to repel a violent and dangerous attack which the deceased was then making, or was about to make upon him. The right of self-defense, of a party violently assaulted by another to repel such attack, and fully protect himself, is a law of nature, it antedates all written enactments, and is fully recognized in the laws and legislation of all civilized people." Then follows the portion on the subject of self-defense above quoted, which in turn is followed by a full exposition of the right of the person attacked to act upon appearances.

Immediately following the instructions thus given by the court of its own motion upon the right of self-defense, the court, at the request of the defendant, instructed the jury as follows:

(1) "If the jury believe from the evidence that at the time of the fatal shot complained of here, the defendant was

attacked by the deceased in a manner to excite the reasonable fear of a reasonable man, and did so excite the reasonable fear of the defendant herein, that he was in danger of great bodily harm at the hands of the deceased, and that the defendant, while still under and by reason of such reasonable fears, shot and killed deceased, then such killing was not a crime.''

(2) ''It is a law of this state that when a person not in fault is violently attacked by another, he is under no obligation to retreat, but may stand his ground and defend himself, even to the extent of taking the life of his adversary, if necessary. In such a case it is the duty of the one attacking to desist.''

(3) ''If you find from the evidence introduced in this case that the deceased came rushing out of his house with a loaded gun in his hand, and attempted to slay the defendant without any provocation on the part of the defendant, and that it was necessary to kill deceased in order to save his own life, then you are instructed that you must acquit the defendant.''

(4) ''You are also instructed that the fact that one is a trespasser upon the premises of another will not justify the other in taking life, and if the one trespassing is violently attacked, and is threatened with serious bodily injury, he may repel that attack by whatever force is necessary, even to the extent of taking his assailant's life.''

In view of these very explicit and direct instructions given by the court upon the right of self-defense, it is impossible to believe that the jury did not fully understand that defendant had a right to defend himself against threatened serious bodily injury even to the taking of the life of his assailant, though defendant were himself a trespasser upon the premises of deceased.

While in the first part of its instruction on the right of self-defense the court committed the fault of using the word ''aggressor'' instead of ''assailant,'' and the words ''withdrawn from the contest,'' instead of ''have endeavored to decline any further struggle,'' in other parts of the same instruction the proper words were used, and as we have seen, explicit and direct instructions as to the right of self-defense, predicated upon the precise claim of defendant as to the facts. The faults in the instructions are not such as to call for a reversal

of the judgment.   (*People* v. *Newcomer,* 118 Cal. 263, [50 Pac. 405].)

In addition to the point urged as to the giving of the instructions above discussed, appellant very briefly refers to the refusal of the court to give four instructions proposed by defendant.   As to these offered instructions it is sufficient to say that we have examined them, and so far as they embody correct principles of law, or were applicable to the case, they were fully covered by other instructions given.

No other errors have been called to our attention.

The judgment and order are affirmed.

Cooper, P. J., and Kerrigan, J., concurred.