[Crim. No. 108. Third Appellate District.—April 7, 1910.]

THE PEOPLE, Respondent, v. D. M. BOND, Appellant.

CRIMINAL LAW—MURDER—SUPPORT OF VERDICT FOR MANSLAUGHTER.—
Upon trial of a charge of murder, where the wife of the deceased, corroborated by her daughters, testified for the prosecution that defendant deliberately fired the fatal shot, without necessity, though her testimony was inconsistent in some particulars, and the evidence for defendant showed that defendant and a codefendant were deputy fish and game commissioners who had arrested the deceased for unlawful fishing, who endeavored to reach for his gun under his wagon, and was commanded by the codefendant with a drawn pistol to stop, whereupon deceased seized hold of such pistol, and tried to wrest it from the codefendant's hand, and in the struggle the codefendant shot him twice with the pistol, and the defendant fired another shot, which hit the deceased, and shortly afterward he died, a verdict against the defendant for manslaughter was sufficiently supported.

ID.—PROVINCE OF JURY—CREDIBILITY OF WITNESSES—WEIGHT OF EVIDENCE—REVIEW UPON APPEAL LIMITED TO INHERENT IMPROBABILITY.—The jurors in such case are the exclusive judges of the credibility of the witnesses and of the weight of the evidence, and appellate courts are bound by the verdict, unless it appears that the testimony in support of the verdict is so inherently improbable as to demand its rejection. *Held,* that it cannot be said that the wife of the deceased, as a witness, was not honestly mistaken in reciting some of the less important details of the occurrence, or that her story was not substantially correct as to the vital points surrounding the homicide.

ID.—FIRING OF FATAL SHOT—QUESTION FOR JURY.—It was a question for the jury who fired the fatal shot; and if there is any evidence in the record from which a rational inference might be drawn that defendant fired the fatal shot, the verdict is conclusive on that question. *Held,* that it cannot be said in view of the evidence in the record that the verdict against defendant on that question was unwarranted.

ID.—THEORY OF AIDING AND ABETTING CRIME.—Upon the possible theory that the codefendant fired the first shot, which caused a flesh wound, that defendant fired the second shot which contributed to the fatal result by wounding defendant and making him loosen his hold, and that the codefendant fired the fatal shot, the defendant was properly found guilty as having aided and abetted the crime.

ID.—COMMUNICATION OF PURPOSE OF CODEFENDANT TO DEFENDANT NOT REQUIRED.—It was not necessary that the codefendant should have

communicated to the defendant his purpose to fire the fatal shot to make the defendant chargeable as a principal. If, with the knowledge of the defendant, the codefendant feloniously made the assault, and the defendant voluntarily assisted in taking the life of the deceased, although he did not fire the fatal shot, both would be equally guilty, and the defendant would be an aider and abettor of the crime committed.

ID.—ABSENCE OF CONSPIRACY — AIDING OR ENCOURAGING CRIME.—Although there was no conspiracy to commit an offense, still if one person commits an offense, and the accused was present and knew the intention of the other, and aids by acts or encourages by words or gestures the person engaged in the commission of the offense, he would be guilty of the offense committed.

ID.—RATIONAL CONCLUSION OF GUILT FROM EVIDENCE—SUFFICIENCY OF EVIDENCE TO CONVICT.—Since a rational conclusion may be drawn from the evidence either that the defendant fired the fatal shot, or wrongfully contributed to the death of the deceased, or that the codefendant wrongfully made a felonious attempt to kill the deceased, and that defendant, with knowledge of such assault, aided in the consummation of the unlawful purpose and therefore became an aider and abettor of the crime, his contention as to the insufficiency of the evidence to convict him cannot be upheld.

ID.—INSTRUCTIONS—ABSENCE OF PREJUDICIAL ERROR.—It is held that there was no prejudicial error in the giving or refusing of instructions; that all the elements of every degree of crime involved in the offense charged were fully defined; that nothing was omitted necessary for the information of the jury; that there was no conflict in the instructions when construed together; and that the theory of the defense, as formulated for the defendant appealing, was fully presented to the jury in the instructions.

ID.—JUSTIFIABLE HOMICIDE BY ARRESTING OFFICER—CONSISTENT INSTRUCTIONS—CONSTRUCTION WITH CHARGE.—It is held that instructions as to the law of justifiable homicide by an arresting officer were not inconsistent, when they were to the effect that if the officer is authorized to make the arrest, he may use whatever force is necessary to accomplish his purpose and overcome whatever resistance may be offered, and that if the resistance was of such a nature that it appeared to the officer as a reasonable man that he or anyone acting with or under him was in danger of receiving great bodily harm, he would be justified in killing the prisoner; but that this right appearing to him as a reasonable man to overcome all resistance, even to the taking of life, cannot be used as a subterfuge to take life without necessity; and that any ambiguity therein is fully cured by the remaining charge of the court, completely expressing all the conditions to which the evidence relates and under which the right to take the life of the deceased existed.

ID.—EVIDENCE—REMNANTS OF SHIRT WORN BY DECEASED.—The court did not err in admitting in evidence the remnants of the shirt worn by deceased at the time of the homicide, which had been in the custody of the sheriff from the time when it was removed from the body. If appellant relied upon the absence of a proper foundation for its admission, he should have called the attention of the court thereto, or have questioned the witness concerning it.

ID.—TESTIMONY OF SHERIFF TO DIRECTION OF FATAL BULLET.—The court properly allowed the testimony of the sheriff, who had inspected the body after the homicide, and was competent to describe what he saw, that a bullet had entered the left side of the deceased, and passed through his body and came out on the right side; and where that fact appears without conflict, the testimony, in view of the conceded facts, was favorable to the appellant.

ID.—OPINION EVIDENCE—AGE OF DECEASED.—The court properly allowed a witness long familiar with the deceased to give his opinion as to his age. The rule seems to be that age is provable by the inference of any competent observing witness.

ID.—OFFERED EVIDENCE TO SHOW NONWORKABLE CONDITION OF FISHING LADDER — INFERENCE OBVIATED BY INSTRUCTION.—Any inference from offered evidence to show the nonworkable condition of a fishing ladder within the prohibited distance from which defendant was fishing that it would not be a misdemeanor to fish there is obviated by an instruction that "the fish commissioners placed deceased under arrest for the violation of the game and fish laws of California committed in their presence."

ID.—EVIDENCE OF TREATMENT OF ANOTHER PERSON ARRESTED.—The court properly excluded offered evidence to show the manner in which the game and fish commissioners had treated another person previously arrested for violating the fish law, as not being pertinent to disprove the commission of the crime for which the defendant was being tried.

ID.—CROSS-EXAMINATION OF CODEFENDANT — ABSENCE OF PREJUDICIAL ERROR.—It is held that no prejudicial error appears upon the cross-examination of the codefendant as to his evidence upon the preliminary examination; that preliminary questions were properly allowed without producing the transcript, and that further answers were so satisfactory that no prejudice could possibly have resulted to the defendant; and that there was no prejudicial error upon any subject matter of his cross-examination.

APPEAL from a judgment of the Superior Court of Tehama County, and from an order denying a new trial. John F. Ellison, Judge.

The facts are stated in the opinion of the court.

Jas. T. Matlock, Jr., Braynard & Kimball, and W. H. Orrick, for Appellant.

U. S. Webb, Attorney General, and J. Charles Jones, for Respondent.

BURNETT, J.—The defendant and one M. A. Carpenter were jointly charged with murder. They were tried separately and the defendant Bond was convicted of manslaughter. He has appealed from the judgment and the order denying his motion for a new trial.

On August 20, 1908, appellant and the said Carpenter, who were deputy fish and game commissioners, were at a certain point on Battle creek, in Tehama county, looking for an individual who, they had been informed, was violating the fish and game law. They walked up the creek and observed the deceased, an Indian named Robert Junior, engaged in unlawful fishing. The officers went away in search of the other party, but returned in a short while and placed the Indian under arrest. With Junior at the time were his wife, his daughter and his granddaughter. There is a sharp conflict in the testimony as to what occurred at the scene of the arrest, but it is agreed that all the parties proceeded up the hill to the camp of the deceased. An entirely different account from the statement of the defendants as to what occurred at the camp is given by the Indians. According to the former, the history of the affair is about as follows: Upon their arrival the deceased looked around and about the wagon as though searching for something, the Indian woman taking her position at the rear wheel thereof, the evidence without conflict showing that while Junior was down at the creek fishing the Indian girls had placed his rifle under the wagon and covered it with a quilt. Deceased then went out to a tree and an outhouse, which were near, and immediately turned back, looked under a board and then started toward the wagon. Bond and Carpenter were watching him and the latter stated to the former: "I guess he hasn't got any gun." They then started toward their buggy, Bond being in advance about fifteen feet. When they had gone about twenty feet they heard a commotion at the rear end of the wagon and looking back they saw the Indian woman shov-

ing deceased away and saying to him, "Oh, no; oh, no; go away." The deceased was crouching down to get under his wagon. Carpenter, who was carrying a fish basket containing fish which he had taken from deceased, threw it down and hastily returned to the wagon where Junior was endeavoring to get the gun which had been partially exposed. When Carpenter was within four or five feet of him the Indian ran around the right hind wheel of the wagon and got hold of the gun barrel and Carpenter leveled his revolver at deceased and said to him: "Get away from there; let that gun alone; you are crazy." Deceased then straightened up and suddenly grabbed Carpenter's pistol with his left hand, catching hold of Carpenter's arm and coat sleeve with his right hand. They then struggled for the possession of the revolver out toward a certain tree. During the time Carpenter fired a shot and when they reached the tree he fired again and deceased fell away from him to the ground. When Carpenter drew his pistol the defendant Bond was about twenty feet away and he hastily returned to the wagon, but did not arrive until after Carpenter had fired the first shot. Two other shots were fired about the same time, one by Carpenter and the other by Bond. At this time Carpenter was trying to lunge away from the Indian and they were still struggling together. Bond testified that he fired the shot "to make him (Junior) let loose of Carpenter. He was struggling with Carpenter for the possession of the gun at that time." One bullet shattered the left shoulder of the deceased and another passed through his body, entering from the side just above the nipple, the point of exit being three or four inches lower, causing his death a few seconds thereafter.

It is stoutly insisted by appellant that the evidence is insufficient to support the verdict of manslaughter. It is virtually conceded that there is testimony tending to show that the crime was committed, but the contention is that it must be disregarded on account of the want of credibility of the witnesses so testifying. In this connection we deem it necessary to refer only to the widow, who was the principal witness for the people. It is contended that it appears she contradicted herself in important particulars, when we compare her testimony at the coroner's inquest, the preliminary

examination and the trial of the defendant. On two essential propositions, it is contended by appellant, she is entirely inconsistent, to wit: "As to whether deceased straightened up and turned around before stepping away from the wagon, or straightened up and stepped backwards from the wagon, also as to whether the point of entrance of Bond's bullet was on the left or right side of deceased, she having at the time of the trial changed her testimony in both of these particulars from that given by her at both the coroner's inquest and the preliminary examination. In addition to this she has made the very startling and unnatural statement that defendant Bond, a deputy fish and game commissioner, deliberately and in cold blood fired the shot without saying a word or a moment's warning, and without any hostile demonstration on the part of deceased." But how can we say that the witness was not honestly mistaken in reciting some of the less important details of the occurrence and that her story was not substantially correct as to the vital facts surrounding the homicide? Is it not a matter of common knowledge that honest and intelligent witnesses differ radically in their statements of even less exciting events which they have witnessed and that they are often strangely uncertain as to details which seemingly would make a lasting impression upon the memory? We should not demand of this untutored Indian woman a more tenacious memory, a clearer impression of the surrounding circumstances attending an event of such excitement and trepidation or a more consistent statement of its various features than experience and observation demonstrate may be expected from more intelligent and favored observers of such an occurrence. And while it does seem somewhat incredible that a public officer should be guilty of such brutality as is described by this witness, it must be admitted that the annals of crime contain the record of many deeds equally cruel and inexplicable. But the complete answer to the whole contention of appellant readily suggesting itself is that the jurors are the exclusive judges of the credibility of the witnesses and of the weight of the evidence, and unless the testimony in favor of the verdict is so inherently improbable as to demand its rejection appellate courts are bound by it. It is needless to add that it is not a question of whether the higher court is convinced by it of de-

fendant's guilt or may be satisfied of defendant's innocence. The Indian woman did testify clearly and positively to facts from which only the inference can be drawn that the defendant committed at least the crime of manslaughter, unless it can be said that there is no sufficient evidence that defendant's shot caused the death of deceased. Indeed, giving full credit to her statements, and assuming that there was a sufficient showing that appellant's shot contributed to the fatal result, the conclusion would follow that there should have been a conviction of murder. But it is probable that, recognizing the not uncommon disposition of mankind to yield somewhat to the influence of interest or prejudice in giving testimony of important events of deep concern to the witness, the jury believed that all the witnesses to the homicide were not entirely candid, and while rejecting the theory that defendant maliciously killed the deceased, they were satisfied that he was not altogether blameless and should be convicted of the lesser offense.

At any rate, here is some of the testimony which we are asked to brush aside as unworthy of credence: "My husband he pass around the wagon and went over here where this table was and looked in the box and then come back along here and I caught him by the arm and called his attention to this loose wagon nut. He was standing near this loose wagon nut when I had this conversation with him about the monkey wrench, and Carpenter was over there with his fish basket and Bond was standing over here near the right hind wheel of the wagon. The time that I saw Bond shoot my husband was when my husband turned around and was facing over towards the oak tree, then my husband staggered back to the live oak tree and was holding on to one of those cross-bars, and he was there when Carpenter shot him. My husband didn't reach around to pick up the gun and didn't offer to fight Bond, and didn't tell Bond that he would fight him, and didn't tell him that he would cut him or shoot him. He didn't have a club in his hand. He didn't have any rock to go and strike Mr. Bond. He didn't have any knife at all. He didn't offer to fight Mr. Bond at any time. I was right there all the time."

The testimony of the girls as to what occurred at the camp in the main corroborates the statements of the widow.

Another circumstance to which attention is directed by appellant to show the improbability of the testimony of the Indian witnesses relates to the entry and exit of the bullet. It is argued that since the ground was comparatively level and Junior was admittedly much taller than the defendant, if the shot had been fired as related by said witness the bullet would have left the body above the point of its entry. But this is a matter of speculation, and it overlooks the familiar fact that the course of such wounds through the tissues of the body is often eccentric and apparently opposed to the recognized laws of physics. Besides, there was evidence from which the jury had a right to infer that the position of defendant, as testified to by the Indian witness, was considerably higher than the place upon which Junior was standing.

But it is further insisted by appellant: 1. That "the evidence is insufficient to show that defendant fired the shot which caused the decedent's death"; and 2. It "totally fails to show that any conspiracy was entered into between Carpenter and defendant, or that the latter aided and abetted the former in the commission of the homicide."

As to the first proposition it is said: "Of the three shots fired, Carpenter fired two and defendant one. One of the three missed the decedent, another inflicted a flesh wound merely, while the third passed through the most vital parts of the body, causing instantaneous death." It is claimed that there is no evidence to show that the defendant fired this shot which passed through the body. In arguing the importance of this feature of the case appellant says: "Even had the authorship of the fatal shot been merely one of a series of incidental or secondary facts necessary to establish the defendant's connection with the affair, instead of being, as it was, the paramount issue in the case, it is certain that it would have had to be proved to a moral certainty, and in such a manner as to exclude every other reasonable hypothesis." (*People* v. *Phipps,* 39 Cal. 333.) But answering the last suggestion first, it should be sufficient to say that the rule announced is for the jury and not for a reviewing court. If we can find any evidence in the record from which a rational inference might be drawn that defendant fired the fatal shot, our inquiry as to this feature can go no further. It is, of course,

well settled that "If the evidence which bears against the defendant, considered by itself and without regard to conflicting evidence, is sufficient to support the verdict, the question ceases to be one of law of which alone this court has jurisdiction—and becomes one of fact upon which the decision of the jury and the trial court is final and conclusive." (*People* v. *Emerson*, 130 Cal. 562, [62 Pac. 1069].) There is this to be said, also, that it is a mere inference drawn by appellant from the evidence that one shot "inflicted a flesh wound merely," while another caused "instantaneous death." One of the witnesses testified that the shot which inflicted what appellant calls "a flesh wound merely" "broke the arm completely, but we couldn't find out if it had left the body at all, and I don't know whether that bullet that entered the arm went down into the heart or not." Another witness who declared on direct examination that one of the shots "pierced his arm about the center of the arm up near the shoulder, breaking his arm and lodged in the bone," said on cross-examination: "I didn't see whether that bullet went out or not. There was no indication of it. It might have gone down and lodged in the deceased's arm. I couldn't tell whether it stopped in a bone or went on into the body." No autopsy was held, and there is probably nothing in the respective positions of the participants at the time of the homicide or in the course of the bullets to afford any assistance in determining who fired the fatal shot. There is—it may be admitted— no certainty as to its source, and it cannot be positively affirmed which shot missed the deceased, which of the two, if only one, or whether both striking the body caused the fatal termination, or how long the deceased survived the fatal blow; but the question with which we are concerned is, do we find in any of the circumstances detailed by any of the witnesses substantial support for the inference that appellant fired the fatal shot?

According to the transcript, the widow testified "D. M. Bond shot my husband. Shot him right here. (Showing.) My husband he hold him right here this way (showing), and he go back that way; and he hold this pole here and he come across and he hold him here, and he do this way (illustrating by holding hands on body), 'Oh!' And he do that way. (Showing.)" It thus appears that the witness illustrated

the actions of Junior after the first shot was fired by appellant. While, manifestly, we have an incomplete reproduction of those movements, there is sufficient in the transcript to support the inference that the Indian was seriously wounded. The convulsive movements of the body and the position in which the hands were placed, apparently described by the witness, may have carried to the jury the conviction that the shot fired by Bond was the one that passed through the body and caused the death of the deceased. We cannot say, in view of the record, that such conclusion is unwarranted. According to the witness, the question of the infliction of the fatal wound narrows itself to two shots—one fired by appellant and the other by Carpenter—since she declares that the last shot was fired into the air when she struck Carpenter's pistol while her husband was lying on the ground. It is quite probable that both of these shots which took effect contributed to the death of Junior; but, at any rate, the solution of the question as to who caused his death must be found in the circumstances detailed by the witnesses, and it cannot be said that the inference which connects appellant with the fatal result is unsupported.

But again, it will not be disputed that the jury had a legal right to reject a portion of the testimony of the defendants and also of the witnesses for the prosecution. The jury, basing their conclusions upon the evidence, may have adopted substantially the following theory: That the Indian assaulted Carpenter at the creek, as testified to by the latter; that defendants harbored resentment in consequence of Junior's violent conduct; that, after arriving at the camp, Carpenter, without even the appearance of justification, drew his pistol and made an effort to shoot the deceased; that the latter seized the pistol and while the two were struggling for its possession Bond, understanding the situation, deliberately fired a shot which contributed to the fatal result and caused the Indian to relax his hold upon the weapon and thereupon Carpenter fired the last shot, which was followed immediately by the death of Junior. Upon this theory it could not be doubted for a moment that appellant could be convicted properly as an aider and abettor of the crime. "The word 'aid' does not imply guilty knowledge or felonious intent, whereas the definition of the word 'abet' includes knowl-

edge of the wrongful purpose of the perpetrator and counsel and encouragement in the crime." (*People* v. *Dole,* 122 Cal. 492, [68 Am. St. Rep. 50, 55 Pac. 581].) Or, as defined in *State* v. *Tally,* 102 Ala. 25, [15 South. 722, 737], cited by appellant: "The legal definition of 'aid' is not different from its meaning in common parlance. It means to assist; 'to supplement the efforts of another.' (Rapalje and Lawrence's Law Dictionary, p. 43.) 'Abet' is a French word compounded of the two words 'a' and 'beter'—to bait or excite an animal; and Rapalje and Lawrence thus define it: 'To abet is to incite or encourage a person to commit a crime.' An abettor is a person who, being present or in the neighborhood, incites another to commit a crime and thus becomes a principal in the offense." It would not be necessary for Carpenter to have communicated his purpose to appellant to make the latter chargeable as a principal. If, with the knowledge of Bond, Carpenter feloniously made the assault and the former voluntarily assisted in taking the life of the Indian, although he did not fire the fatal shot, both would be equally guilty. It would be absurd to say that if Bond knowingly contributed to the death of Junior he would not be an aider and abettor of whatever crime was committed. There is nothing opposed to this view in the decisions cited by appellant. For instance, in *Walker* v. *State,* 29 Tex. App. 621, [16 S. W. 548], the court of appeals of Texas said: "But again, in order to hold the defendant a principal where he did not participate in the actual infliction of the fatal wound, it is absolutely necessary for the state to show that he knew of Shearer's intent to commit the murder or fire the fatal shot, and that knowing this intent on the part of Shearer he aided it or encouraged him by acts or words to do so." Or, as it is stated in *Lyons* v. *State,* 30 Tex. App. 642, [18 S. W. 416] : "If there be no conspiracy or agreement, each would be held responsible for his own acts. But, though there was no conspiracy to commit an offense, still if one commits an offense, and the accused was present and knew the intention of the other and aids by acts or encourages by words or gestures the person engaged in the commission of the offense, he would be guilty of the offense committed. But he would be guilty only to the extent of his knowledge or

for the natural and reasonable consequences of the acts aided or encouraged by him.''

There can be no controversy about the doctrine announced in *Wilson* v. *State* (Tex. Cr.), 24 S. W. 409, and other similar cases cited by appellant, that ''If two or more persons conceive the intention at the same time to strike B. without previous concert, and do strike him without knowing the intention of the other, each would be responsible for his own acts, but would not be an aider or abettor of the other. To apply this rule to this case, if appellant, without concert with Sam, and without knowledge of his intentions, conceived the intention to and did strike Bagley with a rock about the time that Sam stabbed him, he would not be responsible for said act; nor would he, in striking Bagley, be aiding or abetting Sam in his acts. But, notwithstanding this, if appellant assaulted deceased with the rock he would be responsible for the homicide; or, if the blow with the rock contributed materially to the death of Bagley, he would also be responsible.''

Appellant's contention as to the insufficiency of the evidence cannot be upheld, therefore, for the reason that a rational conclusion may be drawn therefrom—either that he unjustifiedly fired the fatal shot, or wrongfully contributed to the death of the deceased, or that Carpenter made a felonious attempt to take the Indian's life, and appellant, with knowledge of such assault, aided in the consummation of the unlawful purpose and therefore became an aider and abettor of the crime.

Appellant complains because the court refused to charge the jury ''That if no aiding and abetting by the defendant in the homicide, and no conspiracy between him and Carpenter had been shown, and if there existed a reasonable doubt as to which of them inflicted the wound from which the deceased died, the defendant was entitled to be acquitted.'' Nothing, however, seems to have been omitted that was necessary for the complete information of the jury. All the material elements of every degree of crime included in the charge were clearly defined and the jury were instructed that ''Unless you believe from the evidence to a moral certainty and beyond a reasonable doubt that Robert Junior was killed by the defendant D. M. Bond and by no other person;

or that he was killed by said defendant and another person who had conspired together to commit the crime, or that he was killed by some other person while said defendant aided and abetted such other person in killing him, it will be your duty to acquit the defendant.'' The foregoing was given at the request of the defendant and embodied a recognition of the three aspects of guilty participation as a principal in the commission of a crime which are described in section 31 of the Penal Code, as where one ''directly commits the act constituting the offense, aids and abets its commission, or not being present has advised and encouraged its commission.'' There is no evidence in the record that prior to the killing the defendants ''had conspired together to commit the offense,'' and therefore that portion of the instruction might well have been omitted, but appellant cannot complain, because he requested it, and, besides, it is clear that it could not have prejudiced the jury. It may be said, also, that it was not error for the court to refuse the instruction that ''If there is not a conspiracy proven then the defendant did not aid and abet, and if you do not believe beyond a reasonable doubt that Bond's shot killed Robert Junior then I instruct you that the defendant Bond is entitled to a verdict of acquittal.'' ''Conspiracy'' implies an agreement to commit the crime, while to ''aid and abet'' requires actual participation in the act constituting the offense. It is therefore manifest that one may ''aid and abet'' without having previously entered into a conspiracy to commit the crime.

The court declined to give to the jury the definition of conspiracy. There seems to have been no necessity for such is the one to which we have already referred, and we must definition. The only instruction in which the term appears assume that the average juror would know what the court meant by the expression ''had conspired together to commit crime.'' It is not open to the imputation, as claimed by appellant, ''that the fact that the defendant and Carpenter had formed a joint or common purpose of arresting law breakers and of enforcing in a lawful manner the law passed for the protection of fish would have made them conspirators and liable for the acts of each other while in the execution of that purpose.'' The instruction, by necessary implication, excludes from consideration any agreement except one

to commit "the crime." The "crime" referred to is clearly the felonious killing of the deceased. It is claimed that appellant was entitled to an *affirmative* charge upon the subject covered by said instruction, and *Phipps* v. *State,* 34 Tex. Cr. 608, [31 S. W. 657], is cited, wherein it is stated: "The charge of the court instructs the jury who are principals, and throughout, on behalf of the state, in instructing the jury as to each grade of the offense, the jury are told, if you believe that M. V. Phipps either alone or acting with Tom Phipps as charged in the indictment did certain acts, then he would be guilty of the offense, etc. *But nowhere in the charge* are the jury instructed affirmatively if Tom Phipps killed the deceased and the defendant did not act or utter no word in aid or encouragement of said Tom Phipps, then he would not be guilty of any offense. Inasmuch as the evidence in this case, as before stated, fails to show that M. V. Phipps did any act in aid of said homicide, at the time, such a charge was pertinent and was called for, and should have been given by the court in an affirmative and substantive manner." But here the jury were told unequivocally that they must believe beyond a reasonable doubt that one of these several conditions existed or else they must acquit. It is difficult to understand how the instruction could have more positively "affirmed" the duty of the people to establish one of these conditions to justify conviction.

It is further claimed that the instructions upon the question what would constitute justifiable homicide when committed by an officer in making an arrest were confusing and conflicting. The instructions complained of were: "A peace officer may arrest anyone committing a misdemeanor in his presence, without a warrant. In the making of the arrest, or in preventing an escape after the arrest, the officer, when resisted by the offender, is not bound to retreat; but may use such physical force as is apparently necessary on the one hand to effect the arrest by overcoming the resistance he encounters, or on the other to subdue the efforts of the prisoner to escape, but he cannot in either case take the life of the prisoner, unless it appears to him as a reasonable man, from all the circumstances, that the taking of the life of the prisoner is necessary to prevent the infliction of great bodily injury upon himself or upon those acting with or under him,

or to prevent the killing of himself or those acting with or under him," and again: "The defendant, as an officer of the law, had a right, in endeavoring to arrest and retain the said Robert Junior, if said Robert Junior had committed a public offense in his presence, to use all the force that was necessary, or that appeared to him as a reasonable man to be necessary, to overcome all resistance, *even to the taking of life,* and if he use no more force than was reasonably necessary, or that appeared to him as a reasonable man to be necessary, to then and there overcome any resistance that was being made to him, he should be acquitted," etc.

The contention is that these instructions are irreconcilably conflicting inasmuch as in the former the jury were told that "the defendant was not justified in killing the decedent merely because this was necessary in order to arrest him," and in the latter that "if the decedent had committed a public offense in the defendant's presence, the latter had a right 'to use all the force that was necessary or appeared to him as a reasonable man to be necessary to overcome all resistance, *even to the taking of life.*' "

The distinction made by appellant is, we think, more fanciful, than real. We must, of course, read the whole of the instructions together and so considered there is no conflict whatever. The proposition of law expressed in both of these instructions is that where the officer is authorized to make an arrest he may use whatever force is necessary to accomplish his purpose and overcome whatever resistance may be offered. Unless the resistance, however, should be of such a nature that it appeared to the officer as a reasonable man that he, or anyone acting with or under him, was in danger of receiving great bodily injury, he would not be justified in killing the prisoner. The reason is plain; in such case he could overcome the resistance without killing the prisoner. A resistance that does not threaten great bodily injury can and should be overcome without a homicide. Therefore he may use all the force "that appears to him as a reasonable man to be necessary to overcome all resistance, *even to the taking of life,*" as stated in the second quoted instruction, but this claim of resistance is not to be a mere subterfuge; the resistance must be such as appears to the officer likely to inflict great bodily injury upon himself or those acting

with him. Otherwise there is no necessity to take life and it cannot be permitted.

But if there was any inconsistency or confusion in the quotations already made, it is entirely removed by the concluding portion of the second instruction, which we deem it unnecessary to set out in full. Even if we were to concede that the court used an inaccurate or incomplete expression in the foregoing we would still be required to hold that it was without prejudice, as when all the charge is considered we find that all the conditions concerning which the evidence relates and under which the right to take the life of deceased existed were fully and completely expressed. (*People* v. *Turpin*, 10 Cal. App. 526, [102 Pac. 680].) The theory of the defense, as formulated by counsel for appellant, was fully presented to the jury in the instructions, and we see nothing to criticise therein.

The court did not err in admitting in evidence the remnants of the shirt worn by deceased at the time of the homicide. It had been in possession of the sheriff from the time it was removed from the body, and the only objection made was that the proper foundation had not been laid. If appellant was relying upon the claim that it was not shown to be in the same condition as at the time it was removed, he should have called that to the attention of the court or interrogated the witness concerning it. It was probably an unnecessary piece of evidence. There is nothing in the record to show that there was anything in the appearance of the cloth to throw any particular light upon the tragedy, but it is clear as anything can be that we cannot say that the introduction of the fragment of the shirt influenced the jury against appellant. As far as we are advised, the effect could have been no different if a portion of any other garment worn by the deceased had been received in evidence. The case is not at all similar to the one cited from Mississippi, where the skull of the deceased was produced without sufficient preliminary proof.

Appellant assigns error in the ruling of the court "allowing Sheriff Boyd to testify that the bullet entered the left side of deceased, passed through his body and came out on the right side." The objection was that the "proper foundation had not been laid and the witness was not properly

qualified." The witness had inspected the body and was competent to describe what he had seen. If it should be said that the position of the place of entry and of exit involved expert knowledge, or that it was not a proper subject of expert testimony, the complete answer is that the other evidence shows without conflict that the bullet entered the left side, and this is the theory upon which appellant assails vigorously the testimony of the Indian woman. That the deceased was shot to death appears without controversy, and the answer to the said question, in view of the conceded facts, is favorable to appellant.

One Bramlett, a witness for the prosecution, was permitted to give his opinion that deceased was seventy years of age. The rule seems to be that "Age is provable by the inference of any competent observing witness. This is true both in the case of human beings, whether they be adults, minors or children, and in the case of animals or inanimate objects." (17 Cyc. 98.) The witness showed he was qualified by testifying that he had known the deceased for something like twenty-five years. The jury, though, probably attached no importance to his testimony, as it was very much weakened on cross-examination, and the widow testified that her husband was strong enough to whip either of the defendants.

The court overruled the objection to the question asked in the cross-examination of the witness Pedlar: "Do you know whether that fish ladder was in working order at the time you were there?" The contention of appellant is that "This cross-examination and the introduction of evidence as to the condition of the fish ladder must have prejudiced the defendant's case to the extent of leading the jury to believe that fishing within the prohibited distance of a fish ladder which was not in working order would not be a misdemeanor." But, as pointed out by the attorney general, this inference was obviated by the instruction of the court that the defendants were deputy fish commissioners, and while acting in such capacity "they placed deceased under arrest for the violation of the game and fish laws of California committed in their presence."

One Anderson had been arrested by defendants on August 19th for violating the fish law, and by him appellant sought to show that he had been properly treated by the officers.

The court rightly sustained an objection to the proffered testimony. So far as we are informed, the conduct of defendant upon a different occasion has never been held pertinent evidence to disprove the commission of a crime of which he is being tried. If appellant desired to have the jury apprised, as to his character or reputation in the community for the trait involved in the charge, the statute provides how that should be done. It is needless to say that the said attempt did not meet the requirement of the law.

Appellant complains because the court, without requiring the record to be shown the witness, permitted the cross-examination of the codefendant Carpenter as to his failure to testify at the coroner's inquest and the preliminary examination concerning certain matters related at the trial. The questions were: ''I will ask you, Mr. Carpenter, if at the coroner's inquest, when you were detailing this affair before the inquest, if you testified to anything before the jury about hearing voices upon the bank?'' and ''Now, I will ask you if at the coroner's inquest you testified to anything about the peddler fishing there?'' and ''Now, I will ask you if both at the preliminary examination of this case and at the former trial of this case, if you didn't place my hand upon this gun and testify that that was the manner in which the Indian grabbed it?''

As to the first two, they were merely preliminary for the purpose of impeachment and were properly allowed, although the transcript of the testimony of the witness was not first shown him. (*People* v. *Hart*, 153 Cal. 261, [94 Pac. 1042].) It is also clear that the matter is of so little importance and the answers were so satisfactory that no prejudice could possibly have resulted. It is not contended that the incident referred to in the last question was photographed, and we must assume that the record would have afforded no assistance. As to this, it may be said also that no unfavorable inference could have been drawn from the explanation of the witness.

Witness Carpenter was cross-examined as to whether he put his hand upon the shoulder of deceased when arresting him, and also whether the fish ladder was in working order. Appellant contends that this may have created in the minds of the jury an erroneous impression that the arrest of de-

ceased was unlawful.   But, as we have seen, this was obviated by the instruction given in reference to the arrest.

The objection that they were not proper cross-examination to the questions asked of the defendant as to an agreement to see the deceased and his family home, and in reference to the distance from the right hind wheel of the wagon to the tree, was properly overruled.   Besides, they related to trivial matters and the answers could not possibly have influenced the result.

The record has received our careful attention to the end that no injustice might be done, but, in our opinion, it cannot be said that the appellant did not have a fair trial or that there is not substantial support for the verdict.

To interfere with the conclusion of the jury and of the trial court would be, as it appears to us, a violation of the well-established principles governing the action of appellate tribunals.

The judgment and the order are affirmed.

Chipman, P. J., and Hart, J., concurred.