[Crim. No. 940.    Third Appellate District.—October 16, 1926.]

THE PEOPLE, Respondent, v. E. I. ROBERTS, Appellant.

[1] CRIMINAL LAW — MURDER OF WIFE — PREVIOUS ASSAULTS — EVIDENCE.—In this prosecution for murder, where the defendant accused of killing his wife testified that he would not under any circumstances strike his wife, it was not prejudicial error for the trial court to permit witnesses for the prosecution to be questioned as to whether they had ever seen defendant strike his wife, where their answers were in the negative.

[2] ID.—SUBSEQUENT ACTS AND CONDUCT OF DEFENDANT—EVIDENCE— VERDICT.—In such prosecution, where defendant claimed that his wife took poison and that he administered an antidote, his failure to call a physician and his act in leaving her shortly afterward and staying away until notified of her death were facts to be considered by the jury in determining whether defendant's account was true or untrue.

[3] ID.—CONVICTION OF MANSLAUGHTER—SUFFICIENCY OF EVIDENCE. — In such prosecution it is held that the evidence was sufficient to sustain a conviction of manslaughter.

(1) 17 C. J., p. 309, n. 70.    (2) 30 C. J., p. 204, n. 85, p. 205, n. 87. (3) 30 C. J., p. 316, n. 68.

APPEAL from a judgment of the Superior Court of Humboldt County and from an order denying a new trial. George D. Murray, Judge.    Affirmed.

The facts are stated in the opinion of the court.

Puter & Quinn for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

PLUMMER, J.—The defendant was convicted of the offense of manslaughter upon an indictment charging that on or about the thirtieth day of January, 1926, in the county of Humboldt, the defendant feloniously and with premeditation and malice aforethought did kill and murder his wife, Dorothy Roberts.    To the judgment of conviction the defendant interposed a motion for a new trial.    His motion being denied, this appeal is prosecuted from the order denying

said motion and the judgment of conviction just referred to. It appears from the record that the defendant and the deceased were husband and wife living in a small lumber camp some fifteen miles from the town of Scotia, in the county of Humboldt. On the evening of January 30th the defendant returned to the small house or shack where he and his wife resided, accompanied by C. H. Foster and J. E. Elliott, arriving at his home at about 6 o'clock P. M. It appears that Foster had been drinking for several days and was sick when he arrived at the home of the defendant and was shown to one of the rooms in the building by the defendant, and there lay down and went to sleep and remained in that condition until after the circumstances leading to the death of Dorothy Roberts had taken place. The testimony also indicates that Mrs. Roberts had been drinking, although she was up and about and was proceeding with the preparations for the evening meal. It may be here stated that the record shows that the deceased was possessed of a violent and uncontrollable temper, and during her fits of rage acted as though temporarily insane. A short time after the defendant returned to his home as herein stated and during the preparation of the evening meal the defendant in handling some of the dishes, allowed one of them to slip from his hands. This apparently enraged the deceased and she immediately began an attack upon the defendant. A scuffle ensued, during which time the man Elliott, hereinbefore referred to, testified that he went out on the porch, that while he was there he heard blows,—that sounded like striking with the fist or hand, which the witness illustrated by striking himself upon the chest. After this incident had occurred and the disturbance between the deceased and the defendant had quieted down, Elliott re-entered the house and went into the kitchen where the dinner was being prepared. It also appears that during the period of time to which we have been referring the defendant tried to induce Mrs. Roberts to go and lie down on the bed and let him prepare the evening meal. The witness Elliott states that Mrs. Roberts used very strong language toward her husband and rushed at him as though intending to strike him with her fists. A short time after the defendant and Elliott had sat down to eat the evening meal, according to the testimony of the defendant and Elliott, the deceased walked out of the

back door and stood in front of a window and while there drank from a bottle containing lysol, came back into the room and said good-by to one of the children; that the defendant immediately took hold of Mrs. Roberts, held her down to the floor and administered an antidote of milk and salt water; that the salt water and milk oozed back from the mouth and they detected the odor of lysol. In one part of the testimony it is said that the deceased vomited, but a careful scrutiny of the testimony would lead to the conclusion that the deceased did not vomit, but that all the liquid that exuded from her mouth was the liquid antidote which the defendant and Elliott were endeavoring to administer. In a short time the deceased became quiet and the defendant and Elliott picked her up and laid her upon a bed in an adjoining room. After all this had occurred and the deceased had become quiet the defendant, according to his testimony, thinking that Mrs. Roberts was out of danger, took Mr. Foster down to a place named McKees, a mile and a half distant, in order that Foster might be taken to Scotia, where he could have medical treatment. McKees was simply a place where a pool-hall and card-rooms were maintained. The witness Elliott did not accompany the defendant to McKees, but remained at the home of the defendant. Some little time after the defendant had departed the witness Elliott discovered that Mrs. Roberts was dead. His testimony is to the effect that he went into the room where she was lying several times; that at first she seemed to be breathing normally, but along shortly after 10 o'clock he discovered that she was dead. The witness Elliott then went down to McKees in search of the defendant, where the defendant was found playing a game of cards, and informed him of the death of Mrs. Roberts. We may here state that the testimony of the defendant is to the effect that the deceased had on previous occasions taken iodine with suicidal intent and that upon administering an antidote she had recovered and that he thought the antidote administered in this case had proven effective.

[1] The testimony of a neighbor who lived some two hundred feet distant from the house occupied by the defendant and the deceased was to the effect that some time during the evening of January 30th she heard scuffling and some-

one or something fall. She described the noise as that which would be made by the falling of a chair. The testimony further shows that the defendant and the deceased had had considerable trouble at different times and in different places, but in every instance it is shown that the violent and ungovernable temper and jealous disposition of the deceased started the controversies. During the course of the trial it appears that a number of the witnesses were questioned as to whether they had ever seen the defendant strike the deceased, but the answers to all these questions appear to be in the negative. It is urged upon this appeal that the asking of such questions constituted prejudicial error, but an examination of the record shows that the defendant himself, upon direct examination, testified that he would not . under any circumstances strike his wife, and that the questions asked him upon cross-examination relative to striking his wife simply followed the line of the direct examination of the defendant. Had the defendant not been asked the question which opened the door, the prosecution would have been precluded from pursuing the line of cross-examination permitted by the trial court. The questions and answers which opened the door to which we refer are as follows: "Q. Did you strike her upon the head with anything? A. No, sir. Q. Did you strike her with your fist? A. I did not. Q. Did you strike her with any kind of an instrument? A. No, sir. Q. A blackjack or a club or anything of that kind? A. No, sir. Q. Would you under any circumstances do such a thing? A. No, sir. Q. You thought a great deal of your wife, did you not? A. I certainly did."

As to the questions asked of other witnesses as to whether they had ever seen the defendant slap the deceased, it is sufficient to say that no objection appears to have been made to the introduction of such testimony. It may also be added here that the testimony of all the witnesses who were asked such questions was to the effect that they had never seen anything of the kind. With these circumstances presented, the contention of the prosecution was that the deceased came to her death by blows administered upon the head of the deceased and not from lysol poisoning; that the lysol taken immediately after the administration of and receipt of the blows had taken no effect upon the system of the deceased by reason of the fact that the deceased's condition, and

especially the stomach, were negative. On the part of the defendant it is contended that the deceased died of lysol poisoning and that no blows were administered by the defendant and that the evidence in the case does not warrant the jury in finding the defendant guilty of manslaughter.

In determining this question we shall follow the rule announced by this court in the case of *People* v. *Bond,* 13 Cal. App. 175 [109 Pac. 150]: "It is, of course, well established that 'if the evidence which bears against the defendant, considered by itself and without regard to conflicting evidence, is sufficient to support the verdict, the question ceases to be one of law of which alone this court has jurisdiction—and becomes one of fact upon which the decision of the jury and the trial court is final and conclusive,' " citing *People* v. *Emerson,* 130 Cal. 562 [62 Pac. 1069]. The same rule is announced in different language in *People* v. *Glover,* 141 Cal. 233 [74 Pac. 745], where the court says: "We cannot invade the province of the jury and substitute our judgment for theirs, as to the sufficiency of their finding on controverted facts. There may, it is true, arise an exceptional case, where the testimony in behalf of the prosecution is so improbable and incredible that the court, convinced of its falsity or absolute insufficiency to warrant a verdict of guilty, would deal with it as a matter of law. This, however, must be an extreme case." Following the rule just stated, we will briefly examine the evidence. The record shows that shortly after the death of the deceased she was taken to a near-by undertaking parlor where in a short period of time certain bruises upon her head made their appearance. There were four or five of these bruises. The undertaker who had charge of the remains injected embalming fluid known as formaldehyde. His statement and that of another undertaker are to the effect that the injection of formaldehyde tends to bring out and disclose any bruises which exist upon the body. This testimony is contradicted by medical testimony to the effect that the bruises would appear in a short period of time even though no formaldehyde or embalming fluid were injected in the body. The testimony of one of the physicians who examined the body of the deceased and performed the autopsy was to the effect that one side of the head of the deceased had

received a number of blows; that one blow had slightly indented the skull; that the blows were such as could only be made by a soft instrument such as the hand and not by a hard instrument such as a piece of wood or metal; that these blows had not produced any lacerations upon the surface, but upon removing the scalp and laying back the skin the lacerations produced by the blows were observable; that these blows were sufficient to cause death and that death resulted therefrom. The testimony of the physicians also was to the effect that the finger-prints underneath the chin of the deceased indicated that she had been choked and that death could have resulted as well from the choking.

H. A. Duffey, an analytic chemist of some years experience, testified that he first made an examination of the stomach and brain of the deceased; that an examination of the system and brain demonstrated that the deceased had not died from lysol poisoning; that he afterward examined the kidneys and other organs of the deceased; that there was no creosote poison in the brain of the deceased nor in the kidneys; that upon an examination of the stomach and brain of the deceased it was demonstrated that the deceased had come to her death from other causes than poisoning; that the poison so found in the stomach had been taken within such a short time preceding the death of Mrs. Roberts that it had not been taken up by the circulatory system and had had no effect other than that of burning a small spot in the stomach where the lysol was found; that at the time the lysol was taken by the deceased the stomach was in a negative condition and, therefore, the lysol poison was not distributed through the system. The testimony of Drs. Fleming and Wallace was also to the same effect. Dr. C. O. Falk testified that when a person dies from lysol poisoning and the body is embalmed with a fluid composed of formaldehyde as a base, that the organs, such as the brain, kidneys, liver, and heart, would show no trace of the poisoning. This witness, however, testified upon the theory that death had been occasioned by lysol poisoning and not that the lysol poisoning had been found in the stomach without time being given for its absorption and distribution through the system. The analytical chemist further testified that the embalming fluid would not destroy the evidence of lysol poisoning; that creosol is a cyclo-hydro carbon, and the ring is not subject to oxidation. It can

only be opened by boiling nitric or sulphuric acids. Aldehydes of the embalming fluid can have no effect on the creosol ring, and that where one dies from lysol poisoning the embalming fluid does not destroy the evidences of such poisoning.

One of the witnesses testified that the blows on the head were such as might have been made by a blackjack or some similar instrument; that three of the wounds above the skull showed no discoloration; that lower down on the jaw there was a hemorrhagic area, the three wounds on top of the head showed discolorations, but the tissues above it—the scalp showed absolutely no discoloration; that the macerated condition under the scalp was caused by the severe blow before death; that the blows upon the skull were severe blows, they were severe enough to bruise the skull; that there was an interval between the blow over the eye and ear and the top of the head; that the blows on the top of the head would have shown hemorrhage had the deceased lived long enough, but that her death took place before the hemorrhage could occur; that the blow over the eye was received at a previous period; that there was a decided interval between the blow on the jaw and the one over the eye, the blows over the head occurred immediately before death. This is shown by the fact that no opportunity was allowed for hemorrhage; that the blow severe enough to bruise the skull would have caused hemorrhage had she lived long enough thereafter for it to take place; that it was hard to determine the length of time between the blow over the eye and the ear and the time of the death, but that the blow on the side of the head occurred immediately before death; that there was an interval of perhaps a minute; that the blow was severe enough to dent the skull and would have produced a hemorrhage of the tissues.

There was also testimony to the effect that blows could be administered upon the head sufficient to cause death without leaving any immediate scar, bruises, or lacerations upon the skin and that such was the case in this instance.

[2] As controvertive of the testimony to which we have referred, witnesses testified that, in their opinion, the deceased came to her death from lysol poisoning and not from the blows; that the lysol could not have been taken after the administration of the blows sufficient to cause death. The

testimony of the witnesses for the prosecution, however, was to the effect that the lysol poison was taken immediately after the administration of the blows and that the condition of the stomach and the fact that lysol was found only in the stomach led to the conclusion that the stomach and circulatory system of the deceased were in a negative condition and rendered so by the blows which immediately thereafter led to her death. The record also discloses some inconsistencies in the statement made by the defendant at the coroner's inquest and his testimony given upon the trial as to why he went down to McKees a short time after his wife had taken poison. It is undoubtedly true that the defendant was placed in a more or less unenviable light before the jury by reason of his actions in not calling in a physician to attend the deceased, in leaving her a short time after the occurrences which we have narrated, going down to McKees to take Mr. Foster, or for any other reason, and remaining there engaged in playing cards until notified of his wife's death, but such actions were actions to be considered by the jury in determining whether the defendant's account of the transaction was true or untrue, and whether he had or had not been instrumental in causing the death of his wife. It must be admitted that such actions would be deemed unnatural on the part of a husband who was solicitous as to the welfare of his wife. The natural thing to have done if Foster needed medical attention would have been for the defendant to have sent Elliott with Foster down to McKees and remained himself to look after the wife's welfare, instead of leaving her in charge of the witness named Elliott.

[3] The sufficiency of the evidence to sustain the verdict and justify the conclusion reached by the jury was presented to the trial court, the judge of which had the opportunity not only to weigh the testimony, but also to observe the demeanor of the witnesses while giving testimony and, therefore, was in a better position to determine the credibility that should be given the different witnesses than is the case with an appellate court examining the cold record. Whatever the actual facts may be, the testimony gleaned from the record and which we have set forth in substance herein precludes this court from interfering with the judgment on the ground that the evidence is insufficient.

The judgment and the order of the trial court are therefore affirmed.

Hart, J., and Finch, P. J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 13, 1926.