## UNITED STATES v. POLAKOFF et al.
### No. 329.

Circuit Court of Appeals, Second Circuit.
June 10, 1940.

Irving Spieler and Samuel J. Siegel, both of New York City, for defendant-appellant George Polakoff.

Louis Halle, of New York City, for defendant-appellant William Albert.

Louis Halle and Samuel Mezansky, both of New York City, of counsel, for appellants.

John T. Cahill, U. S. Atty., of New York City (Jerome Doyle, Frank H. Gordon, and Robert L. Werner, Asst. U. S. Attys., all of New York City, of counsel), for the United States.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

The chief question on this appeal is the competency of the accused's declarations made by telephone to the prosecution's chief witness, Kafton. The indictment was for conspiring to obstruct justice (§ 241, Title 18 U.S.Code, 18 U.S.C.A. § 241) by influencing an assistant district attorney in his recommendation of sentence to the district judge. The case for the prosecution was in substance as follows. Kafton had himself been indicted for deal-

ing in narcotics, and the accused, Polakoff and Albert, agreed that if he would plead guilty and would pay them a sum of money, they would intervene with the assistant in charge of his case, whom Polakoff knew, and seek to get him to recommend to the judge a light sentence. Kafton became suspicious of this, and went to the district attorney, who sent him to agents of the Federal Bureau of Investigation. Through a telephone in the offices of the Bureau Kafton had a talk with each of the accused, which the agents recorded upon a machine annexed to an "extension" in the same circuit as the telephone that Kafton was using. The declarations of each of the accused, implying as they did an existing agreement by which Kafton was to pay them money, were so damaging that, if they were not competent, the conviction cannot stand. The prosecution seeks to support the evidence on the ground that Kafton was "the sender" of the message within § 605, Title 47 U.S.Code, 47 U.S.C.A. § 605; and that in any event the message was not "intercepted".

The word, "sender", in § 605 is less apt for a telephone talk than for a telegram, as applied to which there can be no doubt of its meaning. If a man sends a telegram, he may consent to its interception even though that prejudice the addressee, as conceivably it might; but if the addressee answers by telegram, he alone can give a valid consent to the interception of the answer. He has a privilege like the sender, which is as immune from surrender by the sender's consent, as the sender's privilege as to the first message was from surrender by his consent. So far there can be no reasonable dispute. Every telephone talk, like any other talk, is antiphonal; each party is alternately sender and receiver and it would deny all significance to the privilege created by § 605 to hold that because one party originated the call he had power to surrender the other's privilege. There cannot be the least doubt of this as to the answers of the party called up; and while it might indeed be pedantically argued that each party had the power to consent to the interception of at least so much as he said, that would be extremely unreal, for in the interchange each answer may, and often does, imply by reference some part of that to which it responds. It is impossible satisfactorily

so to dissect a conversation, and the privilege is mutual; both must consent to the interception of any part of the talk. In the case at bar Kafton's consent was therefore not enough.

██ Moreover, the recording was an "interception". It is true that in the three decisions in which the Supreme Court has interpreted § 605, Title 47 U.S.Code, 47 U.S.C.A. § 605, the prosecuting agents had physically interposed some mechanism in the circuit as it had been constructed for normal use; at least this is what we understand by a "tap". That was not the case here; the recording machine was merely fixed to an existing "extension" of the familiar kind in an adjoining room. We assume that the situation would have been no different, had the agent merely listened at the extension, and taken down what he heard by shorthand. The statute does not speak of physical interruptions of the circuit, or of "taps"; it speaks of "interceptions" and anyone intercepts a message to whose intervention as a listener the communicants do not consent; the means he employs can have no importance; it is the breach of privacy that counts. We need not say that a man may never make a record of what he hears on the telephone by having someone else listen at an extension, or, as in the case at bar, even by allowing him to interpose a recording machine. The receiver may certainly himself broadcast the message as he pleases, and the sender will often give consent, express or implied, to the interposition of a listener. Party lines are a good illustration; and it would be unwise to try in advance to mark the borders of such implications. Here, however, we need not be troubled by niceties, because, no matter what the scope of any such implied consent, it cannot extend to the intervention of prosecuting agents bent upon trapping the "sender" criminally. Violation of the privilege, we are admonished, is so grave a dereliction as to be "destructive of personal liberty" (Nardone v. United States, 302 U.S. 379, 383, 58 S.Ct. 275, 277, 82 L.Ed. 314) and if it is not to be sham and illusion, it must protect its possessor at least against such intrusions. "A decent respect for the policy of Congress must save us from imputing to it a self-defeating, if not disingenuous purpose". Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307. Unit-

890

ed States v. Yee Ping Jong, D.C., 26 F. Supp. 69, is to the contrary, but does not persuade us.

■ Since the case must be remanded we will pass upon the sufficiency of. the indictment, and of the evidence to prove the charge. The indictment merely alleged that the accused conspired "to influence and impede the official actions of officers in and of the United States District Court * * * in order that said Sidney Kafton would receive a sentence of not more than one year and one day". The challenge is that it should have specified who were the "officers" that were to be so "impeded". We do not see why, if the accused were really in ignorance of this detail, they could not have been fully protected by a bill of particulars. Decisions such as Heaton v. United States, 2 Cir., 280 F. 697, and Kellerman v. United States, 3 Cir., 295 F. 796, are of doubtful service today, when objections which do not go to the substance of a fair trial no longer get much countenance. Hagner v. United States, 285 U.S. 427, 431, 52 S.Ct. 417, 76 L.Ed. 861; Berger v. United States, 295 U.S. 78, 84, 55 S.Ct. 629, 79 L.Ed. 1314; Crapo v. United States, 10 Cir., 100 F.2d 996, 1000. Besides, the indictments in each of the decisions relied upon failed to state all the facts of which the crime was constituted.

■ The objection to the sufficiency of the evidence depends upon whether it is a part of the official duty of a prosecuting attorney to make a recommendation to the judge regarding the sentence. It is true that the statute says nothing about this, but the custom has been uniform for over thirty years to my own personal knowledge; and in fact goes far back of that. Sometimes the judge asks for suggestions; sometimes they are volunteered; in either case they are of the greatest service in fixing the sentence, and no prudent judge likes to forgo their benefit. Improperly to influence this function of the prosecuting attorney would be a very successful way of impeding and obstructing the judge himself. We cannot see that Rosner v. United States, 2 Cir., 10 F.2d 675, is in point; the accused was there charged with violation of § 241, Title 18 U.S.Code, 18 U.S.C.A. § 241, because he told one, Miller, against whom an information had been filed, that he would "fix it up" with the district attorney, if Miller gave him

$150; and that Miller should not comply with the district attorney's request to appear and plead to the information. All the decision stands for is that a refusal of the request to appear and plead was not an obstruction of justice; probably that is correct, since the request was not process, but it has nothing to do with the situation at bar.

The indictment at bar was good, and the verdict was justified; but the judgment must be reversed because of the admission of the telephone records.

Judgment reversed; new trial ordered.

AUGUSTUS N. HAND, Circuit Judge (concurring).

I concur in the opinion of Judge LEARNED HAND in the above case and also with the opinion (Per Curiam) in United States v. Fallon, 2 Cir., 112 F.2d 894, because the results reached seem to follow inevitably from the recent decisions of the Supreme Court which have construed the Federal Communications Act as preventing the use of telephonic messages obtained through interception, without the consent of the sender, as evidence in criminal prosecutions.

It may be that the views expressed by Judge CLARK in his dissenting opinion will prevail and I should be gratified if the Supreme Court would go even so far. But it is difficult for me to see how such a line can be drawn in view of the reasons given for the decisions in Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314; Weiss v. United States, 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298; and Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307.

I am convinced that prohibition of the use of wire taps to detect the activities of criminals, who choose to conduct their negotiations by means of the telephone, imposes great and at times insurmountable obstacles upon the prosecuting authorities in the detection and prosecution of crime, nor do I see the fundamental difference between evidence · obtained in this way and by many other methods of detection, which I suppose to be permissible, except for the scope given to the provisions of the Federal Communications Act.

In the face of the foregoing Supreme Court decisions any remedy must rest with the Congress who, in my opinion, can con-

stitutionally permit wiretapping by government authorities with or without such safeguards against abuse as Congress may see fit to impose. Unless and until Congress chooses to act in the premises, the prosecutor must do the best he can without evidence obtained in such ways.

CLARK, Circuit Judge (dissenting).

This decision and that in the companion case of United States v. Fallon, 2 Cir., 112 F.2d 894, mark a long step beyond previous interdictions of the use of telephonic communications as legal evidence. Heretofore it has been settled that the two parties to a conversation by telephone are immune from being confronted in court with evidence of what they said obtained without their knowledge by the tapping of the telephone wires. Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed 314; Id., 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307; Weiss v. United States, 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298. Now it appears that even one party to the conversation is to have his use of such evidence curtailed in ways and to an extent which are not made wholly clear. I cannot believe it is reasonable to go so far. The governing statute, 47 U.S.C.A. § 605, provides that no person not being authorized by the sender shall intercept any communication by wire and divulge or publish its existence or contents. As pointed out in United States v. Yee Ping Jong, D.C.W.D.Pa., 26 F.Supp. 69, the verb "intercept" means "to take or seize by the way, or before arrival at the destined place" (Webster's New International Dictionary, 2d Ed.), and does not aptly refer to a communication which has reached its intended destination and is recorded at one end of the line by one of the participants or, it should be added, by his direction. Reasons of policy justify the making of telephonic communications privileged for the two parties involved; they do not justify making them so privileged to one party as against use by the other.

There are niceties of distinction which may be made between the two cases here, as well as between them and other similar situations where telephonic conversations may be recorded. Except for the suggested exception based on implied consent of the other party, the opinion herewith disregards such distinctions—wisely so, as I believe, since they cannot affect essentials. In this case Kafton, the initiator of the conversation, arranged with the F. B. I. agent to make use of equipment already installed and in common use at the F. B. I. office, where the call was put in. In Fallon's case the agent had been staying with Reilly, the Government's witness, at the latter's home and for his protection after his testimony before the Grand Jury; and when Fallon left a request that he be called, Reilly and the agent arranged for the installation of the equipment in the first instance in Reilly's home, in the second instance at Reilly's summer camp, and then Reilly made the calls. There can be no real distinction—there is none suggested in the statute or by common sense—between these recordings and a transcription made by a private secretary over the telephone in an outer office, or by a servant on an upstairs extension in a house, or even by a person listening at the telephone receiver held by the party to the conversation. Nor can it be of importance whether the transcriber or the party first makes the suggestion for the recording; in either event it is the party who has the power to direct or prohibit its transcription. Neither is it important whether evidence of the conversation comes from the mechanical device of a record or from testimony of those directed to listen in, except that the mechanical device gives the more trustworthy evidence. Indeed, in the Fallon case the agents themselves testified as to what they had overheard, testimony which must be considered objectionable under the decision here.

Hence, but for the suggested exception of implied consent, every bit of evidence of this kind must be illegal save only that given orally by the party himself. And yet this last reservation makes all the other exclusions unreal, as though the trial must be a kind of game where one party may pit his recollection or his trustworthiness against the other party, with the impartial record which would settle the question resolutely excluded. That is, the best evidence must be rejected, contrary to all modern trends in the law of evidence.[1] The unreality is made the greater if we attempt a differentiation based upon im-

---

[1] Cf. A. L. I. Code of Evidence, Tentative Draft No. 1, Rules 116–120; Hear-say and the English Evidence Act, 1938, 34 Ill.L.Rev. 974.

plied consent of the other party. The rationale of such a distinction must go back to a deduction from common experience that one by writing a letter to another or by communicating directly or indirectly with such other does naturally place himself in the power of the other to make use of the communication for his own benefit. If indulged in at all, the idea of consent should naturally apply to the entire communication. That seems not only the reasonable, but also the only practical, line of demarcation.

If, however, consent is not to be found from voluntary participation in a conversation by telephone, then the court must examine each conversation to see if it contains something suggesting consent. That, it would appear, can be found if, and only if, the conversation was to the advantage of the now objecting party. A test of consent so unreal may well lead to the automatic exclusion of all such evidence when objection is made. But, further, a rule which operates to exclude testimony disadvantageous to one party only has consequences at once serious and socially undesirable. From the public standpoint it means that if criminals take the precaution of communicating with each other by wire or radio they obtain a new kind of partial privilege for themselves, and lessen the risk that one of their number can effectively betray them to the police. From the private standpoint it means that a party to the conversation will not be able to protect himself effectively against misconstruction of his conversation or against criminal threats or attempted blackmail. He is not even permitted the simple, natural course of having his private secretary overhear and transcribe the conversation; he and she both would be guilty of a criminal offense. For under 47 U.S.C.A. § 501, any person who "willfully and knowingly"—as here—does a thing prohibited by the statute is guilty of an offense punishable by fine and imprisonment. Reilly testified that he consented to the recording because he felt he would rather have the truth of whatever he said recorded than made a matter of conjecture. That natural course will now be outlawed.

Nor do I see grounds for distinguishing between a record made for the party's own private convenience and a record by him made available to public officials investigating a crime. No such distinction is suggested in the statute. Passing any question why, if a party to a telephonic conversation is himself to be admitted as a Government witness, we should refuse proof of the truth or falsity of his story, we may ask how such a distinction could be applied in practice. In the cases before us Kafton and Reilly were acting in last analysis for their own benefit and to their own great advantage. Indeed Reilly was liable to be indicted by the Grand Jury then in session; it was vitally necessary for him to furnish proof disassociating himself from Fallon. As will often, perhaps usually, happen in such circumstances, the party consenting to the use could save himself only by compromising the other party. And of this necessity he must, after all, be the judge.

Of course, if a part of the conversation is excluded, all must be, including the consenting party's own statements, or else the privilege is rendered largely worthless. Probably the willing party's statements will at most be only self-serving, but in any event they will be too revealing as to the nature of the remainder of the conversation to be admissible.

Now a restriction so far-reaching and so unusual with respect to a device in such common and extensive use as the telephone should be clearly expressed and not discovered only by the process of inference. In the second Nardone case, supra, 308 U.S. at page 340, 60 S.Ct. at page 267, 84 L.Ed. 307, Justice Frankfurter said: "Any claim for the exclusion of evidence logically relevant in criminal prosecutions is heavily handicapped. It must be justified by an over-riding public policy expressed in the Constitution or the law of the land." And he held, upon a weighing of opposing policies, that the statutory requirement, construed in the first Nardone case, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314, to prohibit evidence directly secured by wire-tapping, would also forbid the use of evidence indirectly obtained as a result thereof, since it was "a fruit of the poisonous tree." In the Weiss case, supra, 308 U.S. at page 330, 60 S.Ct. at page 272, 84 L.Ed. 298, Justice Roberts, replying to the contention that the evidence had become admissible because the defendants took the stand to testify as to it, stressed the fact that the evidence had been divulged to the Government before trial,

thus forcing the defendants to testify, such divulgence "was not consented to by either of the parties to any of the telephone conversations," and "the participants were ignorant of the interception of the messages and did not consent thereto." These cases show that the prohibition against wire-tapping must have its reasonable limits.

As has often been pointed out, the objection to wire-tapping is a logical development of the feeling against unlawful searches and seizures—a development shown by Justice Holmes' characterization of it as a "dirty business," in dissenting in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376. The objection has been spelled out of the general terms of the statute upon a careful evaluation of the social need of bringing the guilty to justice and the personal rights so precious to the individual. Or as Justice Roberts said in the first Nardone case, supra, 302 U.S. at page 383, 58 S.Ct. at page 277, 82 L.Ed. 314, "Congress may have thought it less important that some offenders should go unwhipped of justice than that officers should resort to methods deemed inconsistent with ethical standards and destructive of personal liberty." The general view of commentators has been that the doctrine already promulgated goes to the edge of the requirements of the public policy.[2] There can be no such public policy to hamper the normal use of conversation by an individual. If I willingly talk to a man either face to face or by telephone, it cannot be dirty business, or indeed more than I ought to expect, if he uses our conversation for his own ends.

In last analysis we should turn to the statute itself, for that is what we are construing. And that, it seems to me, by its terms excludes the construction here placed upon it. The statute does not refer directly to a tapping of the wires; it provides only that the *communication* must not be intercepted; it contains none of the exceptions or refinements discussed above. If the communication has reached the person for whom it is intended, it is hard to see how it is intercepted when that person directs it to be transcribed. Other parts of this lengthy section tend to support this view. The first prohibition, limiting publication by a person receiving or assisting in receiving, or transmitting, or assisting in transmitting, a communication, seems obviously directed to agents of communications companies, for it contains exceptions for divulgence through authorized channels of transmission or reception, or to proper accounting or distributing officers of the various communicating centers, or to the master of a ship under whom the person is serving, or in response to a subpoena issued by a court of competent jurisdiction, or on demand of other lawful authority. Next comes the prohibition in issue here, and then follows this highly significant provision: "No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by wire or radio and use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto." The clear inference would appear to be that the person *entitled to receive the communication* may himself use it, or the information therein contained, for his own benefit or may have someone else use it for him. The final prohibition is against use by a person of an illegally intercepted communication "for his own benefit or for the benefit of another not entitled thereto." This carries out the same thought. The receiver of a communication is permitted to use it for his own benefit. I think the proffered testimony in each case came within this reservation and was therefore properly received in evidence. In my opinion the judgments of conviction should be affirmed.

---

[2] 53 Harv.L.Rev. 863; 1 Bill of Rights Rev. 48; 34 Ill.L.Rev. 758; 38 Mich. L.Rev. 1097; 27 Mich.L.Rev. 78; 86 U. of Pa.L.Rev. 436; 10 Rocky Mt.L.Rev. 284; 12 Temple L.Q. 409; 16 Tex.L. Rev. 574; Waite, Reasonable Search and Research, 86 U. of Pa.L.Rev. 623; Greenman, Wire-Tapping: Its Relation to Civil Liberties (1938) 7, 45, 46; 8 Wigmore, Evidence (3d Ed.1940) §§ 2184b, 2287.