REITMEISTER v. REITMEISTER et al.

No. 242, Docket 20558.

Circuit Court of Appeals, Second Circuit.

June 23, 1947.

L. HAND, Circuit Judge, dissenting **in** part.

See also D.C., 4 F.R.D. 197.

Samuel M. Ostroff and Isaac M. Rothenberg, both of New York City, for appellant.

James F. Ryan, of Brooklyn, N. Y., for Louis Aaron Reitmeister, Frank Hopp and Cecelia Phillips.

Benjamin H. Siff, of New York City, for Samuel Nachby and Pearl and Julius Lippman.

Before L. HAND, CHASE, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

The plaintiff appeals from a judgment, dismissing his complaint in an action to recover damages for the violation of the Communications Act of 1934.[1] The complaint was in three counts, of which the judge dismissed the second and third at the conclusion of the plaintiff's evidence, but submitted the first to a jury which brought in a verdict for the defendant. The first count was against the defendant, Louis Reitmeister, alone, for "intercepting" and "publishing" a telephone talk between the plaintiff and the defendant, Phillips, and another talk between the plaintiff and the defendant, Hopp. The second count was for a conspiracy of Reitmeister, Hopp and Phillips, to "goad" the plaintiff into telephone talks with Hopp and Phillips, which they would thereafter "publish"; and the third count was against all the defendants for publicly divulging the two talks in the Surrogate's Court for Queens County, New York. The plaintiff argues that as to the first count the judge erred in submitting to the jury the issue of his consent to the "publishing" of the two talks; that he also erred in his rulings

---

[1] § 605, Title 47 U.S.C.A.

as to the admission and exclusion of evidence; and that he was throughout unfair. As to the second count he argues that there was evidence to connect Phillips and Hopp with the "intercepting" and "publishing" of the talks. As to the third count he argues that the "publishing" was not privileged, as the judge held.

The evidence was in substance as follows. The Reitmeister brothers, Adolph and Louis, had been engaged in business together, but had quarreled and separated; and thereafter had been upon extremely bad terms. The plaintiff's wife had died a very short time before the events here in question, and the plaintiff professed to believe that Louis had been the cause of her death; but before, as well as after, his wife's death, he had been in the habit of calling up Louis on the telephone, threatening his life and assailing him in indecent and intemperate language. He would at times get a telephonic connection with the defendant, Phillips, an employee in Louis' office, and be equally offensive. Finally, in the latter part of March, 1941, Louis became so fearful of his brother that he employed a retired policeman, the defendant Hopp, to serve as a bodyguard in constant attendance. The plaintiff engaged Hopp also upon the telephone in the same vein; and at one time—before April 18th, the date of the first of the two talks which are the basis of this action—Hopp suggested to him that "if somebody listened to these filthy conversations of yours and takes a record of them and brings them into court, then you will have something to think about." To this Hopp swore that the plaintiff replied: "The hell, use the record, do what you want. I want the world to know about it." This was the testimony as to the plaintiff's consent to the use of the records on which Louis relied, and which the judge submitted to the jury as a defence.

Some days before April 18th Louis bought a recording machine which would automatically take down what came out of a telephone receiver. He had an extension in his own separate office leading from the main wire, and to the receiver at this extension he could attach the recording machine; his purpose was to get records

of the vituperation and threats which almost daily passed to him or his employees from the plaintiff. The first talk which he so recorded was with Phillips, who told Louis that the plaintiff was on the wire, but who swore that Louis had never told her of the recording instrument. The second talk was on April 24th with Hopp. Louis had told Hopp even before the 18th that he was about to buy a recording machine, and, although Hopp's testimony on cross-examination was somewhat obscure, from it a jury might have found that he knew, when the plaintiff spoke to him on the 24th, that Louis might be recording the talk.

After obtaining the records Louis played them both to Phillips and Hopp and to his lawyer, Friedman; and he had copies made which he lodged with a cousin named Crohn, whom he told to keep them secret. Over a year later, in June, 1942, both records were played in the Surrogate's Court of Queens County, and it is this "publishing" which is the plaintiff's chief grievance. It came about as follows. The plaintiff's wife had made her sister, the defendant Pearl Lippman, executrix of her will, which greatly outraged the plaintiff, who challenged the executrix's account. When the case came on before the Surrogate, the plaintiff took the stand and upon his cross-examination, Pearl Lippman's attorney, the defendant Nachby, asked him whether he had not had the talks with Phillips and Hopp here in question; and upon his denial Nachby offered the records in evidence to establish the falsity of his denials. The Surrogate admitted them and they were read aloud in the court room. Pearl Lippman was a sister-in-law of Louis, and before the trial in Surrogate's Court came on, Louis had told her of the existence of the records and had given them to Nachby so that they might be used at the trial. It does not appear that either Phillips or Hopp had any part in this "publishing," but it may be assumed that the defendant, Julius Lippman, the husband of Pearl, shared in it with Louis, Nachby and Pearl. The judge dismissed the second count because he thought that neither Phillips nor Hopp had been privy or confederate to the production of the

records, or to any later "publishing." He dismissed the third count because he held that the "publishing" of the records at the trial in the Surrogate's Court was privileged. He charged the jury as to the first count that Louis had "intercepted" the talks and would be liable, unless they found that the plaintiff by what he had said to Hopp had consented to the "publishing."

■ The first questions are whether the Communications Act of 1934, 47 U.S. C.A. § 151 et seq., imposes a civil, as well as a criminal, liability upon anyone who "publishes" a telephone message, and whether, if so, the District Court had jurisdiction over the action. Although the Act does not expressly create any civil liability, we can see no reason why the situation is not within the doctrine which, in the absence of contrary implications, construes a criminal statute, enacted for the protection of a specified class, as creating a civil right in members of the class, although the only express sanctions are criminal.[2] In Newfield v. Ryan,[3] the Fifth Circuit has already implied as much as to § 605; and we too have so suggested ourselves in United States v. Goldstein.[4] That the District Court had jurisdiction, if there was a civil right, is too plain for debate.[5] It is true that in the case at bar the message was not interstate, and verbally the section is limited to interstate and foreign messages; but the Supreme Court has held that the section forbids the "interception" of intrastate messages if sent over interstate wires,[6] and the civil right must be coextensive with the criminal liability. Finally, we think that, when Louis recorded the two talks as he did, he "intercepted" messages within the meaning of the section. In United States v. Polakoff,[7] the message was taken down at the receiver's office in the same way as here, and we held that "publishing" it was unlawful. We cannot find that the question has come up again in quite the same form, but the Supreme Court gave our decision at least a limited recognition in Goldstein v. United States,[8] and unless Goldman v. United States,[9] has overruled it, we shall accept it as a valid interpretation of the section. We think that Goldman's case has not done so. The evidence in that case of what Shulman, the sender, had said over a telephone had been recorded upon a "detectaphone" set against a wall in an adjoining room. There was no doubt that the "detectaphone" had "intercepted" Shulman's message as he spoke it into the receiver in the same sense that an eavesdropper would, who was hidden in a closet; but the court held that the section did not apply to such a situation. The message must be "intercepted" by some mechanical interposition in the transmitting apparatus itself, for the message, though sent over the wire, is not immune from disclosure; but only the interjection of an independent receiving device between the lips of the sender and the ear of the receiver. In the case at bar, Louis recorded the talks which passed along the transmitting wire by means of an instrument, interjected in that wire; and we cannot see why an existing lead off the main circuit was different from a "tap" into the wire, made ad hoc.

■ The judge charged the jury as to the first cause of action in accord with what we have just said, but left to them the question whether the plaintiff had not consented to the "publishing" of all his messages. The interest protected by the section is the sender's alone; and the statute expressly recognizes that so far as the sender "authorizes" it, "publishing" shall be lawful. "Authorization" is equally valid, though given in advance and in general terms; and it was for the jury to decide what was the scope of the plaintiff's consent, as well as whether he consented at all. Indeed one cannot be surprised at the verdict, for the fact that the plaintiff was in general given to indecent and fero-

---

[2] Parker v. Barnard, 135 Mass. 116, 46 Am.Rep. 450; Amberg v. Kinley, 214 N. Y. 531, 108 N.E. 830, L.R.A.1915E, 519; Couch v. Steel, 3 E. & B. 402. Restatement of Torts § 286.

[3] 91 F.2d 700, 703.

[4] 120 F.2d 485, 490.

[5] § 41 (1), § 41 (8), Title 28 U.S.C.A.

[6] Weiss v. United States, 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298.

[7] 2 Cir., 112 F.2d 888.

[8] 316 U.S. 114, 121, 62 S.Ct. 1000, 86 L.Ed. 1312.

[9] 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322.

cious utterance, betokened a shamelessness which made it not improbable that he was recklessly indifferent to the opinions of others.

The errors which the plaintiff urges as invalidating the verdict we can very quickly dispose of. The first is that, although the defendants had put in evidence of the plaintiff's bad reputation, the judge refused to allow the testimony of witnesses to his good reputation. If the premise had existed, it would indeed have been an error to refuse; but the premise did not. The evidence of the defendants on which the plaintiff relies was that he had been guilty of equally violent and outrageous outbursts of temper and abuse as well before as after his wife's death. That was not evidence of reputation and had nothing to do with his reputation as evidencing his character; and he had invited the issue because he had sought to excuse the indecency and intemperance of the recorded talks, on the ground that he was unnerved by the death of his wife. Indeed, as we have said, the second count alleged that Louis, Hopp and Phillips had combined to "goad" him into language which was not his habit. The defendant's evidence was highly relevant upon the score of damages, particularly as to the punitive damages which the plaintiff was claiming. As to the plaintiff's charge, for the most part quite unspecified, that the judge was unfair to him in the conduct of the trial, we can find not a shred of support for it in the record; on the contrary he exhibited a moderation which must have been indeed difficult in the face of the disclosures of the plaintiff's shocking habits and his amazing effrontery in asking damages from a jury. The judgment dismissing the first count is affirmed.

As to the second there was no evidence whatever connecting Phillips with the recording of the talks. She denied any knowledge that Louis had bought or installed a recording machine, and Louis denied that he had ever told her of his purchase. Nor was there any antecedent reason for her supposing that he would record the talk of April 18th which was only one of many of the same indecent and scurrilous kind. What we have just said applies to the evidence as it stood at the close of the whole case, although strictly, we should confine our examination to so much only as the plaintiff himself put in, because the judge dismissed the second count at the close of the plaintiff's case. It makes no difference which time we take in the case of Phillips; but conceivably it might in that of Hopp, because, as we have already suggested, his cross-examination might perhaps support the conclusion that by April 24th, he had learned that Louis had a recording machine on which he proposed to record some at any rate of the plaintiff's talks. Whether, had that been part of the plaintiff's case, we should have to hold that there was enough to show some concert between Louis and Hopp, we need not say, because at the close of the plaintiff's evidence there was nothing to connect Hopp with the recording except a passage taken from Louis' examination before the Surrogate in which he said that he had several times recorded the plaintiff's talks, and that at times "we could not record it fast enough and Mr. Hopp * * * was talking to him about 15 minutes and we got a record of it and we just wanted to have a sample of the type of language and threatening language he uses." That was indeed hearsay as to Hopp; but, since it went in without objection we will take it against him. It inculpated him only in case the use of the pronoun "we" necessarily meant Louis and Hopp, which we believe would extend it more than was reasonable. If the plaintiff had meant to rest upon it, he should have gone further.

But even assuming that it was an error for the judge to dismiss the second count at the time he did, we should not reverse the judgment in the posture of the case as it now stands. The second count was for a "conspiracy," and, for the reasons we have given, the judge was in any event right in dismissing it against Phillips. Thereupon there were at most only two possible conspirators left—Louis and Hopp. However, the judgment upon the first count has now become a good defence to Louis upon the second; for it is either a bar or an estoppel, according to whether we regard the "causes of actions"

in the two counts the same or different. This needs no debate if they are for the same "cause of action"; and scarcely more, if they are not, because from the way that the judge left the case to the jury, they must have found that the plaintiff had "authorized" the "publishing" complained of, which would be a good estoppel as to Louis in a new trial upon the second count. Now it is as much a rule governing a civil action for conspiracy as a criminal prosecution, that there must be two conspirators,[10] so that upon a new trial upon the second count, a dismissal would be inevitable. For this reason, even though it were erroneous at the time to dismiss that count, the judgment upon it must now be affirmed.

▇▇▇ The third count alleged that all six of the defendants had jointly "published" the "intercepted" messages by playing the records in the Surrogate's Court. The plaintiff did not connect either Hopp or Phillips with this "publishing" and as to them the dismissal was clearly right. Since the judgment upon the first count was in favor of Louis, as in the case of the second count, upon any new trial that judgment will be a good bar or a good estoppel, so that as to him also the judgment must now be affirmed. So far, my brother Clark and I are in agreement, but he believes for the reasons stated in his opinion that the dismissal of the third count was also right as to the Lippmans and Nachby. Hence it follows that all three of us agree—although for different reasons—that the judgment should be affirmed on the first and second counts and on the third count as to Louis, Hopp and Phillips; and that two of us—Judge Chase and Judge Clark—think that the judgment on the third count should be affirmed as to the Lippmans and Nachby also, although again for different reasons. I am alone in thinking that the judgment on that count should be reversed as to them and for the following reasons. Although at the close of the plaintiff's case it did not appear how they became acquainted with the "contents" of the records, it was a fair, I might even say an inevitable, inference that they

must have become so through Louis, directly or indirectly. How else they could have produced the records themselves in the Surrogate's Court I do not see; at least they were put to their proof to show the contrary. (In fact, Pearl Lippman later testified that she had got them from Crohn to whom Louis had delivered them.) As I read the statute, any one who becomes "acquainted" with the "contents" of an "intercepted" message, may not "publish" it if he knows that it has been "intercepted"; and the records betrayed on their face that the talks had been "intercepted"; and put upon the Lippmans and Nachby the duty of going forward with the proof that the plaintiff, as "sender," had consented. Nor can they avail themselves of the judgment in Louis' favor on the first count, although it protects him individually. They were by hypothesis joint tortfeasors with him and except in exceptional cases joint tort-feasors are not "in privity." Maybe on a trial they could prove that the case at bar was one of the few situations in which the opposite is true, and I would leave that open; but on this record it was otherwise. The fact that as to Louis, it must be assumed that the plaintiff consented does not mean that he consented as between himself and the Lippmans and Nachby. (Incidentally, the third count is not for a conspiracy and the rule peculiar to that kind of suit does not apply; indeed, it would make no difference anyway, because certainly Pearl Lippman and Nachby were jointly concerned in the "publication" in the Surrogate's Court.) Hence it seems to me that these three defendants had to show some privilege to "publish," if they were to avoid a verdict.

The judge dismissed the third count because he held that all six defendants were absolutely privileged to use the records in the Surrogate's Court in defense of Pearl Lippman. Whether that was true depends upon whether § 605 made them available as evidence in that court; and that is not a question of state law. Congress within the scope of its powers is paramount; so far as it saw fit to say that telephone messages should not be "published," the state

---

[10] Duplex Printing Press Co. v. Deering, 254 U.S. 443, 465, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196; Lynch v. Magnavox et al., 9 Cir., 94 F.2d 883, 888, 889.

law must yield. It is true that § 605 excepts from its prohibition "publishing" the message "in response to a subpoena issued by a court of competent jurisdiction, or on demand of other lawful authority"; but it may well be true, as Judge Clark says in his opinion, that this applies only to "employes of the carrier."[11] If so, the statute forbids any one to "publish" an "intercepted" message even under subpoena; and it would have been unlawful for the Lippmans or Nachby to introduce the records in evidence in the Surrogate's Court, no matter what process they used. If on the other hand, we assume that the exception extends to others than employees, still I think that it would not have protected them, even though they were in as strong a position as though they had issued a subpoena to Louis. It is somewhat hard to imagine a situation in which a person interested in "publishing" an "intercepted" message could get the information which made it possible for him to subpoena the "interceptor," unless he did so through an unlawful "publishing" of the "interceptor" himself; and perhaps for that reason the question is academic whether the exception applies to others than "employees of the carrier." Be that as it may, in the case at bar the Lippmans and Nachby did in fact get their information, directly or indirectly, from Louis through an unlawful "publishing," which was independent of, and subsequent to, Louis' original "interception"; and, as I read the second opinion in the Nardone prosecution,[12] that made unlawful all evidence so procured. Indeed, here the case was stronger against the competence of the records than it was in the Nardone prosecution against the testimony there held incompetent; for here the production, being a new "publishing," was itself a wrong unless excused, while there the testimony adduced at the trial was itself innocent, and was held to be incompetent only because it bore the taint of its acquisition. Thus, whether the exception applies generally or not, it seems to me that the judge should have taken a verdict on the third count.

I cannot believe that in such actions a jury may not award damages for "mental suffering." In this respect I should assimilate them to actions for defamation, or for the violation of "privacy," where that is actionable.

Judgment affirmed.

CHASE, Circuit Judge (concurring).

Because I do not believe that our decision in United States v. Polakoff, 2 Cir., 112 F.2d 888 has survived that of the Supreme Court in Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322, I do not think that Sec. 605 of Title 47 U.S.C.A., can now be given the meaning and scope then attributed to it. Accordingly I should affirm the judgment on the ground that no interception of the messages in violation of the statute was shown and, absent an unlawful interception, disclosure was not unlawful.

It seems to me that the opinion in the Goldman case makes it abundantly clear that, "The protection intended and afforded by the statute is of the means of communication and not of the secrecy of the conversation." Page 133 of 316 U.S., page 995 of 62 S.Ct., 86 L.Ed. 1322. When this appellant sent the messages to the persons to whom he intended to talk in Louis Reitmeister's office by means of the telephone connection to that office designated by a call number listed under Louis Reitmeister's name the destination to which he sent them by the method he chose was one which included all telephone receivers in that office and when his messages were received, without previous diversion, at that destination the requirements of Sec. 605 were fulfilled. The protection covered the telephonic means by which the messages were carried in the form of electrical impulses to destination from the instant they started until the instant they arrived there and were reproduced by the receivers into audible messages. That was the method employed by the sender to carry his words beyond the reach of his voice unassisted and that method or means of com-

[11] Nardone v. United States, 302 U.S. 379, 381, 58 S.Ct. 275, 276, 82 L.Ed. 314.

[12] Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307.

munication was not interfered with in any way. Thereafter the legal situation was the same as though he had himself been at the point of destination and there spoken without using any telephone at all.

That what was here done was not an interception of the messages within the meaning of the Communications Act seems to follow from what was said in the Goldman case concerning the meaning of the term "intercept." The language, found on page 134 of 316 U.S., on page 995 of 62 S.Ct., 86 L.Ed. 1322, is as follows: "As has rightly been held, this word indicates the taking or seizure by the way or before arrival at the destined place. It does not ordinarily connote the obtaining of what is to be sent before, or at the moment, it leaves the possession of the proposed sender, or after, or at the moment, it comes into the possession of the intended receiver." At this point United States v. Yee Ping Jong, D.C., 26 F.Supp. 69, 70, a case we had declined to follow in our Polakoff decision, was cited in a footnote to show where the above had been rightly decided. And the instant case is, perhaps, even stronger against interception than that one for in it the receiving station was made a multiple outlet especially for the purpose of "recording" the message; while here the regularly installed telephone apparatus was not changed in any way. It is true that the facts in the Goldman case differ from those in the instant case, but if more is needed to show that the construction there given the statute is applicable here it is found in the sentence in that opinion immediately following the last above quotation from it. "The listening in the next room to the words of Shulman as he talked into the telephone receiver was no more the interception of a wire communication, within the meaning of the Act, than would have been the overhearing of the conversation by one sitting in the same room."

The "overhearing" by the recording instrument in the appellee's office was no more the interception of a wire communication than the overhearing of the messages by a person at that place would have been. Because these messages ceased to be wire communications within the mean-

ing of the statute as soon as they became audible at the receiving station called, the Communications Act did not thereafter apply to make their preservation an unlawful interception or their use an unlawful disclosure.

CLARK, Circuit Judge (concurring in the decision).

As Judge Hand states, I do not share the view that a new trial should be awarded as to certain selected defendants. This, I think he agrees, is an anomalous result, one which in my judgment is to be avoided unless the legal compulsion is strong. I do not think it is. I say so, even though I think that under compelling interpretation of the statute, § 605, the exception for testimony under subpoena does not apply to other clauses of the statute beyond the first, i.e., to testimony of others than "employees of the [communications] carrier." Such was the express limitation, and indeed the rationale, of the first Nardone case, 302 U.S. 379, 381, 58 S.Ct. 275, 82 L. Ed. 314.

There may well be doubt whether there was sufficient evidence to present a question for the jury when the verdict on the count in question, count three, was directed. For, as Judge Hand shows, the direct connection of these defendants only came out later in the presentation of their testimony then offered on behalf of Louis. Thus I do not think Mrs. Lippman was incriminated earlier. The same may also be true as to her husband and the lawyer Nachby; but it is more probable, or at least more easily inferred, on the basis of the testimony as to their acts in the Surrogate's courtroom, that these acts were carefully planned in advance. I mention this weakness of the case because it may thus have appeared to the judge at the time. I shall place my conclusion, however, upon what seems to me the more solid and quite persuasive ground of the effect of Adolph's consent as found in the verdict for Louis.

That consent, as defined by the issues, testimony, and verdict, was in no way limited—if it was possible so to limit it under the language of § 605—to use of the

records by Louis alone. Thus we now have the fact of consent or, in the statutory terms, of authorization by the sender, as established for the case, just as in negligence or indemnity cases the absence of negligence or of breach of duty may be established by a judgment in favor of the principal actor. This should inure to the benefit of persons such as the defendants, who violate no duty to Adolph once his authorization to Louis, the actor in the premises, appears. I have discussed cases from these fields of the law at some length, with appropriate citations, in Riordan v. Ferguson, 2 Cir., 147 F.2d 983, 990–993; and I think the principle is illustrated by Restatement, Judgments, 1942, § 99, under the caption, "Where Liability of a Person Is Based Solely upon the Act of Another." As comment *b* states, the rule of the section, that a judgment on the merits in favor of the person committing the tort bars a subsequent action against another responsible for the conduct, does not apply if there is an independent basis of liability against such other person. But this cannot be the case here because, for reasons stated, the acts of the others were not tortious if Louis had Adolph's consent.

Hence, whatever question there may have been as to the direction of the verdict at the time, now it is settled and the error, if any, is made harmless by the verdict establishing Adolph's authorization of Louis' use of the records. I may add also that I find no proof of any damages. There was no claim for loss of business, sickness, doctor's expenses, or the like; and the loss of the case in the Surrogate's Court may be assigned to the lack of any error in Mrs. Lippman's accounts as executrix more readily than to the belligerent character of Adolph, as demonstrated by the records. Moreover, it is hard to see what pecuniary loss Adolph could sustain by reason of a judgment vindicating the correctness of Mrs. Lippman's conduct as a fiduciary. Unless the jury was allowed to award damages for "mental suffering"— in my judgment, a doubtful basis for recovery in this type of action—there was no foundation for a plaintiff's verdict.

I therefore think the judgment should be affirmed as to all the defendants.