[Crim. No. 5761. In Bank. Jan. 27, 1956.]

THE PEOPLE, Respondent, v. MABEL MALOTTE,
Appellant.

Leslie C. Gillen and John R. Golden for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Chief Assistant Attorney General, and Raymond M. Momboisse, Deputy Attorney General, for Respondent.

TRAYNOR, J.—Mabel Malotte appeals from a judgment of conviction entered on a jury verdict finding her guilty of conspiring to commit a misdemeanor (Pen. Code, § 182), and of contributing to the delinquency of a minor (Welf. & Inst. Code, § 702.) She also appeals from the order denying her motion for a new trial.

On March 10, 1954, Frank Lombardi, at the request of the police, made a telephone call from the district attorney's office in San Francisco. He identified himself and said, "Say, listen Mabel; a friend of mine will be in town tonight, and he will call you. His name is Leonard Windsor. Can you take care of him?" This telephone call was not recorded and the officers present were unable to hear the party at the other end of the line.

At about 8 o'clock that night Inspectors O'Haire and McGuire of the San Francisco Police Department went to room 712 at the Sir Francis Drake Hotel, where they had previously registered. They placed a recording apparatus under one of the beds and connected it to an induction coil, a device designed to overhear a telephone conversation without the necessity of making physical connection with the telephone electrical circuit. Inspector O'Haire then placed a call to Prospect 6-3267, and defendant answered. Their conversation was as follows:

"Hello.

"Is this Mrs. Malotte?

"Yes.

"Uh—this is—uh—Leonard Windsor.

"Yes.

"Uh—Mr. Frank Lombardi told me to get in touch with you this evening.

"Yes; he told me.

"He did?

"Yes.

"Well, I'm staying up at—uh—Sir Francis Drake, room 712.

"All right.

"And—uh—I have my friend, Mr. Bacci.

"Uh—no, he didn't. But I'll—I'll take care of it. What's the name, did you say?

"Bacci.

"All right. I'll—uh—what time do you want them, right now?

"Well, not right at the moment. In about an hour, half an hour, an hour.

"That'll be fine. All right, I'll take care of it.

"Yes, what time shall we expect them, in half an hour, an hour?

"In about an hour will be fine.

"An hour?

"Yes.

"All right.

"Okay.

"All right.

"Bye."

About an hour after the telephone call Yola Boles, a minor, came to the hotel room and introduced herself as Adele. The second girl failed to appear, and Yola gave the officers another telephone number, which they called to ask about the delay. Defendant also answered this call and told them that the other girl would be along in a few minutes.

In the meantime, Mary Madsen, the other girl, thinking she saw a plainclothesman following her, called defendant for instructions. Defendant called the hotel room and asked to speak to "Adele," but was told that she was occupied. Mary again called defendant, as she had been instructed to do on her previous call, and was told that there was nothing wrong and to go on up. Mary, however, refused to enter the hotel unescorted. Defendant told her to call the room and have the customer come down to meet her. Mary called the room, asked O'Haire to come down, and asked him to call defendant. O'Haire made the call and was told by defendant, "Well, I have the girl on the other phone now and she will meet you across the street in the Owl Drug Store." None of these subsequent calls were recorded, nor were they overheard by anyone except the parties thereto.

Inspector O'Haire met Mary at the Owl Drug Store and returned with her to the room. The girls were paid $25 each. They disrobed and got into the beds. The officers took badges from their luggage, identified themselves as officers, and placed the girls under arrest. Then they went to defendant's apartment and waited outside overnight until a warrant could be secured for her arrest. When they secured the warrant, they demanded admittance, explained their purpose, and forced the door when she refused to answer. (See Pen. Code, § 844.) They found her hiding in the attic.

Defendant contends that the evidence of the recorded phone call was inadmissible on the ground that it was obtained in violation of her constitutional rights and in violation of federal and California statutes. She maintains that without the interpretation the recorded call gives to the subsequent transactions no conspiracy is established, leaving inadmissible the extrajudicial acts and declarations of the girls, alleged coconspirators, and uncorroborated Mary's testimony,

concerning her agreement with defendant to serve as a prostitute for her.

The attorney general, relying on *Olmstead* v. *United States,* 277 U.S. 438 [48 S.Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376], and *Goldman* v. *United States,* 316 U.S. 129 [62 S.Ct. 993, 86 L.Ed. 1322], contends that the overhearing of the telephone conversation by means of the induction coil was not a search and seizure within the meaning of the Fourth Amendment to the Constitution of the United States and article I, section 19, of the California Constitution. It is unnecessary to determine whether those cases have been unsettled by *Irvine* v. *California,* 347 U.S. 128 [74 S.Ct. 381, 98 L.Ed. 561], for there is a basic difference between the conduct of the officers in that case and the conduct of Inspectors O'Haire and McGuire, herein. In the Irvine case there were several trespasses when the microphone was installed and subsequently moved in the Irvine home, and an "incredible" invasion of the right to privacy through the eavesdropping over the microphone. The officers monitored indiscriminately not only the conversations pertaining to gambling, but those involving every phase of the Irvine's personal affairs. The technique used by the officers made selectivity impossible. In the present case there was neither trespass nor indiscriminate eavesdropping. Unlike the Irvine case, nothing was overheard but the free discussion of a crime by one who thought her listener a client. ■ When a person discusses the commission of a crime with another, face to face or at a distance through the use of any means of communication, there is no unreasonable invasion of privacy when the other uses the conversation against him.

Defendant contends, however, that the evidence was obtained in violation of the Federal Communications Act (47 U.S.C.A. § 605), and section 640 of the California Penal Code and that it was, therefore, inadmissible under the rule of *People* v. *Cahan,* 44 Cal.2d 434 [282 P.2d 905].

Section 605 of the Federal Communications Act provides: ". . . no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person; . . ." A majority of the federal courts define "intercept" as used in section 605 to mean "to take or seize by the way, or before arrival at the destined place," and hold that there is no interception when the intended receiver consents to or directs the

overhearing of the communication at the moment it reaches him. (*United States* v. *Yee Ping Jong*, 26 F.Supp. 69, 70; *United States* v. *Lewis*, 87 F.Supp, 970, 973, reversed on other grounds *sub nom. Billeci* v. *United States*, 184 F.2d 394; *United States* v. *Sullivan*, 116 F.Supp. 480, 482; *United States* v. *Pierce*, 124 F.Supp. 264, 267; and see dissent of Clark, J. to *United States* v. *Polakoff*, 112 F.2d 888, 891; *cf. United States* v. *Polakoff, supra,* 112 F.2d 888, 889; *United States* v. *Stephenson,* 121 F.Supp. 274, 277.) The United States Supreme Court, approving this definition in the Goldman case, *supra,* 316 U. S. 129, 134, went on to say: "[Intercept] does not ordinarily connote the obtaining of what is to be sent before, or at the moment, it leaves the possession of the proposed sender, or after, or at the moment, it comes into the possession of the intended receiver." (See *Reitmeister* v. *Reitmeister,* 162 F.2d 691.) ■ Thus, as in the present case, where the conversation was recorded by the officers "at the moment" it reached the "intended receiver," there was no interception within the meaning of section 605 of the Federal Communications Act. ■ There was likewise no invasion of privacy in violation of section 640 of the Penal Code.[1] There is no learning of the contents of a communication "fraudulently, clandestinely, or in any other unauthorized manner" when one of the participants to the conversation consents to or directs its overhearing or preservation. (See *People* v. *Channel,* 107 Cal.App.2d 192, 200 [236 P.2d 654].)

Defendant complains that the trial court erred in refusing to instruct the jury on the defense of entrapment. A substantial part of the conversation between Frank Lombardi and defendant, and all of that between Inspector O'Haire and defendant is quoted above. Neither conversation, nor any testimony brought out at the trial by defendant or the People shows more than the creation of an opportunity for defendant to act on her preexisting criminal intent. ■ "Where an accused has a preexisting criminal intent,

[1] "'Every person who, by means of any machine, instrument, or contrivance, or in any other manner, willfully and fraudulently, or clandestinely taps, or makes any unauthorized connection with any telegraph or telephone wire, line, cable, or instrument under the control of any telegraph or telephone company; or who willfully and fraudulently, or clandestinely, or in any other unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any telegraph or telephone wire, line, or cable, or is being sent from, or received at any place within this State . . . , is punishable [by fine and imprisonment.]'"

the fact that when solicited by a decoy he committed a crime raises no inference of unlawful entrapment.'' (*People* v. *Schwartz*, 109 Cal.App.2d 450, 455 [240 P.2d 1024], quoted with approval in *People* v. *Braddock*, 41 Cal.2d 794, 802 [264 P.2d 521].) ■ Thus, as in this case, where there is a complete absence of any evidence of unlawful entrapment, no instruction on the subject need be given. (*People* v. *Alamillo*, 113 Cal.App.2d 617, 621 [248 P.2d 421]; *People* v. *Jackson*, 106 Cal.App.2d 114, 125 [234 P.2d 766]; *People* v. *Harris*, 80 Cal.App. 328, 331 [251 P. 823].)

■ Defendant also contends that even if we admit the evidence to which she objects, the judgment must be reversed on the ground that she was improperly charged with a conspiracy to violate section 240, subdivision (a), of the Police Code of San Francisco. She claims that section 225[2] of the Police Code defines the same offense as does section 240,[3] and argues that since section 225 provides a lesser penalty, she can only be charged with a conspiracy to violate that section. The two sections set forth separate offenses. One can solicit for another (§ 225), but the offer or agreement to commit an act of prostitution is one's own. (§ 240, subd. (a).) ■ Defendant contends that if the sections are not the same, and if section 240, subdivision (a), is construed as referring to an act of prostitution to be committed by the one making the offer or agreement, the evidence shows only a conspiracy to violate section 225 and not section 240, subdivision (a), since she did not offer or agree to commit an act of prostitution. The answer to this contention is that a conspirator does not have to participate in the crime conspired.

Finally, defendant contends that the felony charge was improper and that she should have been sentenced and convicted for a misdemeanor only, on the ground that subsection (g) of section 240 of the Police Code, which makes it a misdemeanor to aid or abet or participate in the doing of any of the acts prohibited by section 240, should be construed as prohibiting a conspiracy to violate section 240. ■ Conspiracy, however, is not synonymous with aiding or abetting or participating. Conspiracy implies an agreement to commit a crime; to aid and abet requires actual participation in the

[2]''It shall be unlawful for any person on any public street or highway or elsewhere, to solicit, by word, act, gesture, knock, sign or otherwise, any person for the purpose of prostitution.''

[3]''Every person is guilty of a misdemeanor who: (a) Offers or agrees to commit any lewd or indecent act or any act of prostitution; . . .''

act constituting the offense. (*People* v. *Bond,* 13 Cal.App. 175 [109 P. 150].) Moreover, section 182 of the Penal Code occupies the field of conspiracy and prohibits a conspiracy "to commit any crime." In prescribing the punishment for conspiracies to commit misdemeanors, no distinction is drawn between misdemeanors defined by city ordinance and those defined by statute. The case of *In re Williamson,* 43 Cal.2d 651 [276 P.2d 593], holding section 7030 of the Business and Professions Code, dealing with conspiracies to violate certain licensing provisions of that code, to be an exception to the general conspiracy provisions of section 182 of the Penal Code, is not in point, for section 240, subdivision (g), of the Police Code of San Francisco cannot be considered such an exception. Although the Legislature can make exceptions to the statutes enacted by it, inferior legislative bodies cannot. (Cal. Const., art. XI, § 11; *Pipoly* v. *Benson,* 20 Cal.2d 366, 370 [125 P.2d 482, 147 A.L.R. 515], and cases cited therein.) Thus, defendant was properly charged with and convicted of a felony.

The judgment and order are affirmed.

Shenk, J., Spence, J., and McComb, J., concurred.

CARTER, J.—I dissent.

I am of the opinion that the judgment should be reversed for failure to instruct the jury on the defense of entrapment. There is evidence in the record which would support a verdict based on that defense. The police officers induced Frank Lombardi, a friend of defendant, to solicit her to commit the criminal act here involved.

The police officer involved in the entrapment testified:

"Q. You, either alone or with the assistance of someone else conceived the idea of setting into motion a set of circumstances to cause someone to commit a crime, isn't that correct? . . . A. Yes."

After the solicitation by Lombardi the police officers posed as decoys and made further solicitation of defendant which culminated in the consummation of the crime. The jury could have concluded that the police originated and set in motion a scheme to *cause* defendant to commit a crime. This could be interpreted to mean that regardless of the innocent or guilty frame of mind of the victim, the police sought to cause her to commit a crime. This purpose was carried out, the first step being a telephone call by Lombardi to defendant asking her to violate the law. In *Cline* v. *United States,* 20 F.2d 494,

defendant procured a narcotic for a dope addict upon the solicitation of the latter whom he knew and who was acting in fear of the police in making the solicitation. The court held there was entrapment as a matter of law. In *United States* v. *Eman Mfg. Co.,* 271 F. 353, the government agent, pretending to be a customer for defendant's medicinal product, "Sulfox," wrote to defendant asking it to send him some. Defendant did so but misbranded the Sulfox which constituted a violation of the food and drug laws when the article was placed in interstate commerce. The court held there was entrapment. In *People* v. *Gallagher,* 107 Cal.App. 425 [290 P. 504], the officers had Dall, an addict and seller of drugs, solicit defendant, an addict, to buy drugs. The drug was left on the street, and, at Dall's request, defendant paid for it and picked it up whereupon he was arrested for illegal possession. The judgment of conviction was reversed for failure to instruct on entrapment, the court stating (p. 429) : "It must be borne in mind that appellant was not charged with having sold or bargained to sell any drugs; nor was any evidence whatever introduced to show that such was his intention. The present case, therefore, is quite different from those upon which respondent seems to rely, showing that a defendant was already in the illegal possession of an article, but was entrapped into selling it. In the case at bar the theory of appellant's defense was that the possession by him of said drug was brought about solely through the instrumentalities of the state's agent and those working under him, for the very purpose of causing his arrest. As said in the case of *In re Moore,* 70 Cal.App. 483 [233 P. 805, 806], 'It may be conceded that it would be violative of sound public policy and repugnant to good morals to uphold the conviction of a person who, being entirely innocent of any intention to commit a crime, was inveigled into its commission by an officer of the law or by a private detective hired for that purpose by some self-constituted guardian of the public morals. (*People* v. *Barkdoll,* 36 Cal.App. 25 [171 P. 440].) ' "

My views on entrapment were expressed in my dissent in *People* v. *Braddock,* 41 Cal.2d 794, 803 [264 P.2d 521].

For the foregoing reason I would reverse the judgment.

Schauer, J., concurred.

Appellant's petition for a rehearing was denied February 21, 1956. Carter, J., and Schauer, J., were of the opinion that the petition should be granted.