KOELSCH, Circuit Judge,
Harry Oliver Seeber herinafter the defendant) appeals from a judgment of conviction upon a jury verdict. The indictment contained four counts. The first three charged defendant with “transmit [ting] in interstate commerce * * * communication [s] containing * * * threat[s] to injure the person of another * * * in violation of the Federal Extortion Act, 53 Stat. 743 (1939), particularly 1(a) thereof, [18 U.S.C. § 875(c)]. The last charged the defendant and his wife jointly with a conspiracy to violate that section.
. , , The conspiracy charge was eliminated at the conclusion of the government s case in chief, when the court granted Mrs. Seeber’s motion ,for acquittal on Hie ground of lack of evidence. The trial defendant continued and he was found guilty on all three substantive counts.
Defendant’s points on appeal relate principally to rulings on evidence and the giving and refusal to give several instructions. They do not include an assignment that the evidence was insufficient to sustain the verdicts, and indeed the proof of defendant’s guilt was over-whelming,
. Thus it appears that during the night of March 2-3, 1962, the defendant made three telephone calls from Phoenix, Arizona to the home of Wm. Herbert Weese, in Barberton, Ohio, a suburb of Akron. During each conversation he expressly threatened to have “Bill Weese” killed unless the latter repaid a debt of $10,000 that “Bill” owed defendant’s wife. Parenthetically, it later appeared that defendant in fact intended to call one Wm. Hayes Weese, but, by mistake, secured the telephone number of Wm. Herbert Weese and, for that reason, talked to the wron Persons. However, at the time neither he nor the others were aware of the error.
Mrs. Weese was alone when the first call came in. When her husband returned home they notified the local police, who responded by immediately sending *574 Officer Francis to their home. While they were talking, the defendant made his second call; the officer answered and, with permission of Weese, identified himself to the caller as “Bill Weese.” During the ensuing conversation defendant disclosed his identity and whereabouts. The third call was received by Mr. Weese himself. It was similar to the others, except Mrs. Weese joined in the conversation.
Defendant first complains of the admission into evidence, over his objection, of three completed “toll slips.” The slips themselves were merely forms of the kind regularly employed by the telephone company in Phoenix to record the fact that long distance telephone calls were made. The notations that appeared on these slips, however, reflected that during the night in question calls had been placed and made from defendant’s home to the Weese number in Akron (Barberton). The operators who put through the calls could not identify the person who made them, or state their source except insofar as the caller had supplied that information.
If there had been no other proof on the subject, save the testimony of the operators, then the slips, without any ■collateral proof tending to link defendant with the calls, lacked authenticity and should not have been admitted. But, as we recently held in Carbo v. United States, 314 F.2d 718, 743 (9th Cir. 1963), Appeal Pending, “[t]he connection between a telephone call and the ■caller may be established circumstantially” ; and in this ease there was ample proof, consisting of both circumstantial ■and direct evidence, to afford a foundation for their admission. Thus it appeared that defendant was arrested the same day the last of the calls was made. He was arrested in the living room of .his home. At the same time, one of the F.B.I. agents went into an adjoining room and there, lying beside the telephone, he observed two notes on which were pencilled the name “Wm. Hayes Weese,” the William Herbert Weese tele•phone number, and several statements similar to those the caller had made to Mr. and Mrs. Weese. On being shown the notes, the defendant admitted his authorship of them and further acknowledged that during the previous night he had called that number.
This evidence was admitted, over objections and defendant now urges that, since it appears the notes were found and admissions were made during a period when the officers had denied him the right to counsel, the trial court, in the exercise of its supervisory powers, should have rejected the evidence because of the “method” in which it was obtained. We read nothing in Crooker v. California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958); Cicenia v. La Gay, 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed.2d 1523 (1958), or any other decisions, that would have required such a ruling under the circumstances of this case. Here the notes were received pursuant to a reasonable search incident to a lawful arrest. They constitute relevant circumstantial evidence and were found in a setting which rendered them admissible without further foundation. Defendant’s admissions clearly were voluntary ; moreover, it is unlike the situation disclosed in McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), where the record was replete with proof that the agents “ * * * subjected the accused to the pressures of a procedure which is wholly incompatible with the vital but very restricted duties of the investigating and arresting officers of the Government and which tends to undermine the integrity of the criminal proceeding. * * * ” Here, it equally appears that the agent’s conduct was well within the prescribed limits of their legitimate investigatory duties. The agents first identified themselves to the defendant and made the arrest. They then advised him of his right to remain silent; afterward they seized the notes and, although they asked him about them, they did not press the inquiry when he declined to explain fully, and they did take defendant immediately before the United States Commissioner, *575 from whose office he was allowed to call a lawyer.
Defendant also assigns as error the ruling of the trial court allowing Officer Francis to testify concerning defendant’s second telephone call. Section 605 of the Federal Communications Act [48 Stat. 1103, 47 U.S.C. § 605] forbids any “ * * * person not being authorized by the sender [to] intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person; * * * ” and defendant points out that he asked to speak to Bill Weese but instead he talked to Officer Francis, because the latter impersonated Weese. Defendant contends that the officer thus intercepted the communication within the meaning of the statute. His argument is that “The key word in the statute is ‘intercept’.” This has been defined as “the taking or seizure by the way or before arrival at the destined place.” Goldman v. United States, 316 U.S. 129, 134, 62 S.Ct. 993, 995, 86 L.Ed. 1322 (1942). Here the destined place was the ear of “Bill Weese” and the message never got to him.
Defendant misconceives the law. We are satisfied that the testimony was properly admitted. Counsel have not cited any case, either federal or state, discussing the question,[1] but our independent research has brought to light a recent opinion rendered by the Supreme Court of New Jersey in a ease entitled State v. Carbone, 38 N.J. 19, 183 A.2d 1 (1962). That case dealt with facts almost identical to those here. In our estimation, it provides both the correct answer to the problem and an invulnerable rationale. We take the liberty of quoting at some length:
“The statute was not designed to create a new category of confidential communications. * * * ‘The protection intended and afforded by the statute is of the means of communication and not of the secrecy of the conversation.’ Goldman v. United States, supra, 316 U.S., at p. 133, 62 S.Ct. 993, 995, 86 L.Ed., at p. 1327. ‘The communication itself is not privileged, and one party may not force the other to secrecy merely by using a telephone.’ Rathbun v. United States, 355 U.S. 107, 110, 78 S.Ct. 161, 2 L.Ed.2d 134, 137 (1957).
*576 “The * * * statute protects the established line of transmission; the prohibition is against intervention into that channel. This is the view of it we find in Goldman, supra, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322, and Rathbun v. United States, supra, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134. The facts of our case do not match those of either Goldman or Rathbun, but they do fall within their composite thesis. In Goldman a detectaphone was attached to a partition wall and thereby officers heard a man in the next room participate in a telephone conversation. The court found no violation of section 605, saying (316 U.S., at p. 134, 62 S.Ct. 993, 995, 86 L.Ed., at p. 1327):
“ ‘ * * * As has rightly been held, this word [intercept] indicates the taking or seizure by the way or before arrival at the destined place. It does not ordinarily connote the obtaining of what is to be sent before, or at ,, , ., , ,, the moment, it leaves the posses- . , ’ , t sion of the proposed sender, or after, or at the moment, it comes . , ’ . „ ’ . , , into the possession of the intend- , . , e íeeeiver.
Thus ‘intercept’ was construed to signify an intervention into the line. * * And in Rathbun the Court held that the statute was not violated when a party to the call arranged for a third person to listen in on a regular extension line and did so without the consent of the other party to the conversation. Thus one who uses the telephone is_ not assured that his messages will reach only the ears for which he meant them. So long as the physical integrity of the established line is not violated, there is no interception within the meaning of section 605.
“In the case before us, there was no tampering with the established means of communication. Indeed the officer was the immediate party to the call. The bettor intended his words to reach the officer, albeit the bettor thought he was someone else, Thus the officer did not ‘intercept’ a message while it was en route to another; there was no other on the line. * * *
«* * * section 605 does not ¿jeaj ajj the evils which may attend the use of a telephone. ^ wrong number may bring to the phone an individual unworthy enough to listen to a message he knows was meant for another, Worse yet, a person may obtain information by making a call under false colors. One may have strong views upon the subject but the question is whether the statute deals with it. We think it does not. The statute speaks of an interception of a communication, and despite any misrepresentation, the fact remains that when A is talking with B, he does not intercept a message which is then en route to C.
. , , , , “The use of a telephone to accom- , . . . , . phsh an improper aim is a topic [1] unto itself. Involved are policy ,. , . . ,, . . . ,. , , questions which the legislative body . , T ,. -u must resolve. Impersonation can be an odious thing, but it need not always be_ It js wrong to impersonate an officer of the law. But js ^ wrong for an officer of the law to impersonate a criminal? Officers commonly do, and many applaud them for their skill and courage. They pretend to be drug addicts. They become privy to conspiracies by misrepresentation. Should it be a crime for an officer to Call a suspected bookmaker and ask for racing information? And should it matter that the officer claimed as well the identity of some specific person known to the bookmaker? We ask these questions simply to emphasize that the subject of impersonation and the like is distinct from the subject of intercepting a communication between others. Keeping in mind, as wo said. *577 at the outset, that we are construing a criminal statute in its application to the witness, we cannot fairly find that the situation before us falls within the denunciation of section 605.”
Defendant criticizes five of the instructions given by the court. He discusses four of them together, saying that none even mentions criminal intent as an essential element of the charges against him, but instead all state or imply that the offenses could be committed by accident or mistake. He attacks the fifth on the ground that it permitted the jury to employ a subjective test to determine whether the statements he made during the telephone conversation amounted to threats.
Although all five instructions are very terse and simply announce bare legal propositions without any accompanying exposition, none is inherently incorrect as far as it goes, or such as to mislead a jury to the prejudice of the accused. Defendant did not request any instruction on matters covered by these instructions and “If a more detailed instruction was desired, it was incumbent upon [him] to make a request therefor.” Western & Atlantic R. R. v. Hughes, 278 U.S. 496, 498, 49 S.Ct. 231, 232, 73 L.Ed. 473 (1929).
While it is true that the four instructions singled out do not refer to the vital issue of intent, and to that extent are incomplete, a reading of the charge as a whole shows that there was no omission in fact for, by another instruction, the court did sufficiently cover the subject, pointing out that the acts charged were done “knowingly” and telling the jury that “the purpose of adding the word ‘knowingly’ was to insure that no one would be convicted for an act because of mistake or inadvertence, or other innocent reason.”
Defendant also complains that the trial court erred in denying defendant’s request to instruct the jury to disregard all testimony of the officers concerning admissions made by defendant’s wife following her arrest. The evidence was properly admitted, for at the time Mrs. Seeber was still a defendant and her admissions were competent as against her. However, after she was acquitted they were no longer properly in the case and the court should have so admonished the jury, especially after being reminded by counsel. Fiswick v. United States, 329 U.S. 211, 67 S.Ct. 224, 91 L.Ed. 196 (1946). The government does not contend otherwise, but urges that the error was harmless within the meaning of Rule 52(a) F.R.Crim.Proc. We agree, for we are convinced that the error could not and did not influence the jury. In substance, Mrs. Seeber merely admitted that she and the defendant did make several telephone calls and talked to the recipients about a debt Mr. Weese owed to her. Such evidence was entirely cumulative. Other witnesses testified to similar admissions made by the defendant himself, and there was also considerable independent proof, some of which was mentioned earlier in this opinion, to the same effect.
During Mrs. Seeber’s cross-examination, the government sought to impeach her on the basis of prior inconsistent statements. Defendant now argues that the court should have advised the jury of the limited use of such prior statements. Again we agree, but note ■ that at the time defendant neither asked the court to so advise the jury nor thereafter requested the court for an instruction. The point is not now available to him.
Of defendant’s remaining points, some are so completely lacking in merit as to render their discussion unnecessary, and the rest are answered by our disposition of the above assignments, adverse to him.
No reversible error appearing, the judgment is affirmed.

. Defendant relies heavily on United States v. Polakoff, 112 F.2d 888, 134 A.L.R. 607 (2d Cir. 1940). In that decision the Second Circuit, speaking through Judge L. Hand, Judge Clark vigorously dissenting, declared that no one but the immediate parties to the conversation might properly listen in on the line unless both consented to the presence of the eavesdropper; “both must consent to the interception of any part of the talk. In the case at bar Kafton’s consent was therefore not enough.” (112 F.2d 889, 134 A.L.R. 607). The writer added that despite the consent of one of the communicants, the activities of the eavesdropper in that case, in the attaching of a recording device to an extension telephone and recording the conversation, constituted an interception of a communication “just as much as if the agent merely listened at the extension and [took] down what he heard by shorthand.” Not all the circuits agreed with Polakoff as, for example, Flanders v. United States, 222 F.2d 163 (6th Cir. 1955) ; Billeci v. United States, 87 U.S.App.D.C. 274, 184 F.2d 394, 24 A.L.R.2d 881 (D.C.Cir. 1950) ; United States v. Bookie, 229 F.2d 130 (7th Cir. 1956), and considerable uncertainty continued to exist over the application of the statute until the Supreme Court, ultimately in Rathbun v. United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957) resolved the issue contrary to Polakoff and consistent with such cases as Flanders. Pointing out that the communication itself is not privileged and one party may not force the other to secrecy merely by using the telephone, the Court, held that, since a party could himself validly record the conversation, he could equally permit another to listen to it either by holding out his headset or over an extension receiver; and the Court added that each party to the telephone conversation takes the risk that the other party may have an extension telephone and may allow another to overhear the conversation. When such takes place there has been no violation of any privacy of' which the parties may complain. It is-manifest that PolakofE is overruled by Rathbun to the extent it holds section 605' clothes a telephone communication with protection against eavesdropping unless-both communicants consent.